******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# MEDICAL DEVICE SOLUTIONS, LLC
## *v.* JOSEPH AFERZON ET AL.
### (AC 44098)

Elgo, Alexander and Sheldon, Js.

*Syllabus*

The plaintiff, M Co., which designs and develops prototypes of medical devices, sought to recover damages for breach of contract and unfair trade practices from the defendants, A, a neurosurgeon and inventor, and I Co., which A and a partner had formed to develop medical devices for use in spinal surgery. In November, 2004, L, an owner of M Co., and A entered into a written agreement under which the parties were to share equally any compensation that resulted from the sale and/or licensing of a medical device conceived of by A, or any version thereof, for use in spinal surgery. The parties' one page contract provided that any required funding or financial commitments were to be part of a separate agreement they would negotiate later and that A was to promptly notify M Co. of any compensation he received for the device or any versions thereof. A further agreed that he was not under any contractual agreement with any other company concerning the device. At the time the parties entered into the written agreement, they also agreed orally that M Co. would create design drawings and a prototype of the device, and, at that time, A gave M Co. his initial drawings of the device. By early 2005, M Co. had prepared a prototype of the device and successfully installed it in a cadaver. M Co. thereafter utilized a different design and produced another prototype that it gave to A by October, 2005. By that time, A had become dissatisfied with M Co.'s work and continued to work on developing the device on his own without informing M Co. In December, 2005, A applied for a patent on an anterior intervertebral spinal fixation and fusion device that he had developed with the help of his son. A thereafter did not respond in writing to a letter from L in February, 2006, concerning the value of M Co.'s services and, in July, 2007, formed I Co. A also did not respond to e-mails from L in 2008 requesting an update on the project, and, in May, 2008, A and his son, without informing M Co., assigned to I Co. their ownership interest in their pending patent. In 2009, several months before A and his son were issued a patent on their device, I Co. entered into a cross license agreement with S Co., a medical device manufacturer, that allowed S Co. to sell spinal fusion devices that were based on the patented device. In exchange, I Co. was to receive shares of A Co.'s stock and, thereafter, certain royalty and other payments. Between June, 2010, and August, 2019, S Co. sent I Co. thirty-four royalty payments, shares of S Co. stock, and $50,000 for I Co.'s expenses in developing and patenting the spinal fusion device. A and I Co. never notified M Co. of their receipt of compensation for the sale and/or licensing of the spinal fusion device. After M Co. first became aware that A had developed and patented a profitable spinal fusion device, its counsel sent letters to A in November, 2017, and in February, 2018, requesting that A inform M Co. as to those matters. A did not respond to either letter. The defendants asserted various special defenses, including that M Co.'s claims were barred by applicable statutes of limitations. M Co. asserted that the running of the statutes of limitations had been tolled pursuant to the statute (§ 52-595) concerning fraudulent concealment and/or the continuing course of conduct doctrine. The trial court initially rendered partial judgment for M Co. on its breach of contract claim and its claim under the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110 et seq.). The court determined that the November 4, 2004 document, as supplemented by the parties' contemporaneous oral agreement, was sufficient to form a definite contract. It further determined that the patented device was a version of the device for which M Co. had created design drawings and a prototype for A, and that I Co. was founded in bad faith to avoid liability to M Co. In awarding damages, the court found that, except for S Co.'s $50,000 payment for expenses, M Co. was entitled to recover 50 percent of the sum of all thirty-four royalty payments I Co. received

from S Co., including the cash value of the payment of shares of S Co. stock, and awarded M Co. damages and prejudgment interest pursuant to statute (§ 37-3a) on its breach of contract claim. Additionally, the court determined that the running of any applicable statutes of limitations had been tolled by both § 52-595 and the continuing course of conduct doctrine but did not determine whether the three year statute of limitations (§ 52-581) or the six year statute of limitations (§ 52-576) applied to M Co.'s breach of contract claim. The court limited M Co.'s recovery under CUTPA to an award of attorney's fees and expenses. The court also awarded M Co. interest pursuant to statute (§ 52-192a) on an offer of compromise M Co. had made that the defendants did not accept. On the defendants' appeal and M Co.'s cross appeal to this court, *held*:

1. The trial court's consideration of parol evidence in determining that the parties entered into an enforceable contract was permissible, as the November, 2004 agreement was not integrated: the written portion of the agreement was clearly not the final repository of the parties' dealings, as it included no obligation on the part of M Co. and, without mentioning M Co., merely stated that another agreement would be negotiated later; moreover, because the agreement was not integrated as to M Co.'s development commitments insofar as it provided that those commitments would be the subject of the separate agreement, the element of the parties' extrinsic negotiation the court relied on was that M Co. orally agreed to create drawings and a prototype, which did not violate the parol evidence rule; furthermore, the court's conclusion that the parties had an enforceable contract was premised on its amply supported factual finding that M Co.'s obligations were orally agreed to on the same date the document was signed, and because that finding was based on the court's credibility findings, the court's subsequent finding that the essential contract terms were agreed to on November 4, 2004, was not clearly erroneous.

2. The trial court properly determined that the patented device and M Co.'s prototype, on which it was based, were within the scope of the parties' agreement, and, thus, it was not improper for the court to conclude that the patented device was a version of the device depicted in A's initial sketches: the defendants could not prevail on their claim that the court failed to apply the language in the written agreement in analyzing whether the licensed patent was associated with the device in A's initial drawings or a version thereof, as the trial court's usage of "relate" reflected its interpretation of the agreement's operative language, and it stated elsewhere in its memorandum of decision that the patent drawings appeared to be a "version" of the same device on which A had promised to partner with M Co.; moreover, it was not improper, as the defendants claimed, for the court to compare A's 2004 sketches to the figures in the patent application and patent to determine if the idea in the patent was related to the idea referenced in the parties' agreement, as nothing in the agreement suggested an intention that a claims analysis under federal patent law be the method used to determine if a subsequent device was a version of the original device, as to which M Co. was entitled to receive compensation, and the court did not rely solely on the figures in the patent, as it mentioned several times in its decision what was described in the patent; furthermore, it was not improper for the court to consider M Co.'s prototype in analyzing the language of the agreement, as the agreement allowed for such consideration, the court considered the prototype to be a link in a chain from A's initial drawings to the design he patented, and the phrase in the agreement, "intellectual property developed associated with this device and/or versions of this device," covered intellectual property that was associated with versions of the device and permitted the court to consider later versions of the initial device.

3. The trial court improperly concluded that any statute of limitations applicable to M Co.'s claims was tolled under either § 52-595 or the continuing course of conduct doctrine:
   a. Because the statute of limitations could no longer be tolled as a result of fraudulent concealment once M Co. had sufficient knowledge of its cause of action for breach of contract, the six factual predicates on which the trial court relied in making its determination could not constitute fraudulent concealment, as A's letter to L in 2006, L's e-mails to A and A's transfer of his patent rights to I Co. in 2008, and I Co.'s receipt of S Co. stock in 2010 preceded any breach of the parties' contract, and, thus, it was impossible at those times for A to have intentionally concealed

or to have had actual awareness of M Co.'s then nonexistent cause of action, and M Co. had already learned of the facts necessary to establish a cause of action for breach of contract at the time its counsel mailed the presuit letters to A; moreover, A's failure to notify M Co. whenever I Co. received compensation from the sale and/or licensing of the patented device merely constituted nondisclosure, which, standing alone, could not establish fraudulent concealment in the absence of a fiduciary duty.

b. The continuing course of conduct doctrine did not apply to the defendants' actions, as A's series of breaches caused separate damages that were readily calculable at the time of each breach, which was incompatible with the doctrine's requirement of an initial wrong and a subsequent continuing duty that are distinct from one another; moreover, there was no evidence to support the court's finding that the parties had a special relationship, as A's continuing duty to report his gains from the device idea to M Co. alone was insufficient to establish a special relationship, the court made no findings that the parties had a confidential relationship or that there was a unique degree of trust and confidence between them, and a mere contractual relationship did not create a fiduciary or confidential relationship.

c. The six year statute of limitations set forth in § 52-576 applied to M Co.'s breach of contract claim, as the contract between the parties was not executory; although there may have been some dispute at trial as to the extent of M Co.'s obligations, neither party challenged the trial court's factual finding that M Co. fully performed its contractual obligations.

d. Because of the viability of the defendants' special defense under the statute of limitations, the trial court's award of expectation damages on M Co.'s breach of contract claim had to be reduced to the total of all expectation damages the court awarded on the basis of the defendants' failure to pay M Co. its 50 percent share of the compensation the defendants received for the sale and/or licensing of the patented device within the applicable six year limitation period, and, although the court unaccountably included 50 percent of S Co.'s $50,000 reimbursement payment to I Co. for expenses in the calculation of M Co.'s expectation damages, this court did not need to modify the adjusted award of expectation damages because the $50,000 payment was received by the defendants before the six year limitation period began; moreover, because the trial court erroneously awarded prejudgment interest on several sums M Co. claimed as expectation damages that were outside the six year limitation period and then compounded that error by awarding additional prejudgment interest on those same sums until the date it rendered final judgment, the interest on both awards had to be reduced to exclude the improperly awarded interest.

e. The trial court properly found that A breached the parties' agreement in bad faith and that those breaches constituted violations of CUTPA: although the court improperly awarded M Co. attorney's fees and expenses on the basis of conduct by the defendants that occurred outside of CUTPA's three year statute of limitations (§ 42-110g), the evidence supported the court's finding that a number of the defendants' breaches of the agreement occurred within the three year limitation period, and, because the court engaged in no discussion of the applicable statute of limitations, and several breaches on which it relied occurred outside the three year limitation period, the case had to be remanded for a determination, if possible, of what portion of the fees and costs awarded were reasonably incurred to litigate that portion of the CUTPA claim that was not barred by § 42-110g.

4. The trial court erred in determining the amount of offer of compromise interest to which M Co. was entitled: the court improperly calculated the interest on the basis of the difference between the amount of M Co.'s recovery and the amount of its offer of compromise, as § 52-192a (c) requires a calculation on that difference only when the offer of compromise is filed by a counterclaim plaintiff pursuant to statute (§ 8-132), the court failed to include its award of prejudgment interest under § 37-3a in M Co.'s total recovery when calculating offer of compromise interest, and it improperly calculated the interest at a rate other than the statutory rate; accordingly, the judgment on the cross claim awarding offer of compromise interest was reversed, and the case was remanded for recalculation of the amount of that award.

   Argued March 10—officially released September 28, 2021

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Haven and transferred to the judicial district of Hartford, Complex Litigation Docket, where the action was withdrawn in part; thereafter, the case was tried to the court, *Moukawsher*, *J.*; judgment in part for the plaintiff, from which the defendants appealed to this court; subsequently, the court, *Moukawsher*, *J.*, granted in part the plaintiff's motion for attorney's fees; thereafter, the court, *Moukawsher*, *J.*, issued an order awarding the plaintiff certain interest and rendered judgment for the plaintiff, from which the defendants filed an amended appeal and the plaintiff filed a cross appeal. *Reversed in part*; *judgment directed*; *further proceedings*.

*John L. Cordani*, *Jr.*, with whom, on the brief, was *Andrew A. DePeau*, for the appellants-appellees (defendants).

*Michael T. Cretella*, with whom was *Brian P. Daniels*, for the appellee-appellant (plaintiff).

*Opinion*

SHELDON, J. This appeal and cross appeal involve a dispute over the defendants' alleged failure to make payments to the plaintiff under a contractual agreement between them to share equally all compensation resulting from the sale and/or licensing of a medical device conceived of by the individual defendant, or any version thereof, in exchange for the plaintiff's creation of design drawings and a prototype of the device based on the individual defendant's initial sketches of it. The defendants appeal from the judgment of the trial court, *Moukawsher, J.*, rendered in favor of the plaintiff on its claims of breach of contract and unfair trade practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., arising from that dispute. The defendants claim that the trial court improperly concluded (1) that the parties entered into a definite and enforceable contract to make the subject payments in exchange for the plaintiff's work, (2) that payments received by the defendants for the sale and/or licensing of an anterior spinal fusion device known as the Solus, which was based on a design patented by the individual defendant after his alleged contract with the plaintiff had been entered into, were covered by the contract, (3) that all statutes of limitations applicable to the plaintiff's claims for relief in this case were tolled under the fraudulent concealment doctrine and/or the continuing course of conduct doctrine, and (4) that the plaintiff was entitled to recover attorney's fees from the defendants under CUTPA based upon the defendants' bad faith breaches of the parties' alleged contract. The plaintiff cross appeals from the trial court's judgment awarding it offer of compromise interest on its judgment against the defendants, arguing that the court improperly calculated the amount of such interest to which it was entitled. On the defendants' appeal, we affirm in part and reverse in part the judgment of the trial court. On the plaintiff's cross appeal, we reverse the judgment of the trial court and remand the case for further proceedings with instructions to recalculate the amount of offer of compromise interest to which the plaintiff is entitled in accordance with this opinion.

The following procedural history and facts, as found by the court and supported by the record, are relevant to this case. The plaintiff corporation, Medical Device Solutions, LLC (plaintiff or MDS), was formed in 2003, by William Lyons in Meriden to engage in the business of designing and developing medical device prototypes. At the time he formed MDS, Lyons was already the partial owner and operator of another company in Meriden called Lyons Tool & Die, which was engaged in the business of manufacturing medical components. MDS and Lyons Tool & Die were operated in the same physical premises, and MDS used Lyons Tool & Die employ-

ees to manufacture its prototypes. MDS initially had one other member, Wayne Young, who remained a 50 percent owner of the corporation until 2007.

The individual defendant, Joseph Aferzon, is an accomplished neurosurgeon and inventor who has owned and operated a private medical practice in Connecticut since 1996. Aferzon frequently partnered with Jeffrey A. Bash, an orthopedic spine surgeon, to perform complex spinal surgeries. Bash estimated that he and Aferzon had performed approximately 10,000 surgeries together by the time of trial. The defendant corporation, International Spinal Innovations, LLC (ISI), was formed in 2007 by Aferzon and Bash to develop medical devices for use in spinal surgery.

Aferzon was interested in making spinal fusion surgery safer and less invasive. In June, 2004, he conceived of a small spinal fusion device consisting of a cage and rotating blades. The trial court described the concept of the device as follows: "The cage is a sturdy tapering rectangle, open, without top or bottom. Within its four walls is a series of rotating, claw-like blades. Doctors insert this cage between the vertebrae of the spine and use a tool to thrust sets of the claws out of the cage's top and bottom. As the claws emerge from their cage, they dig themselves into the ends of the vertebrae, fixing the cage in place between them. This fuses the bones together, and they gradually heal into a single solid bone." Aferzon sketched some initial drawings of the device and, on September 27, 2004, applied for a provisional patent on it with the United States Patent and Trademark Office (patent office) on the basis of those drawings. The patent application titled the device a "CLAWFIX" and described it as a "novel method" for "direct intervertebral fixation." Attached to the application were the initial drawings of the device that Aferzon had sketched in June, 2004.

On November 4, 2004, Aferzon approached Lyons and Young at MDS to ask for their help in creating the device. He provided them with his initial drawings and asked them to create a prototype of the device. During that visit, MDS gave Aferzon a one page document for his signature, which he and Lyons then signed. This document set forth an agreement that is central to the parties' dispute. The subject line of the document reads, "Reference invention: Spinal Cage with Rotating/OpposingBlades," and its text provides: "Joseph Aferzon (inventor/owner of above stated invention) agrees that [MDS] will receive 50% of the total compensation resulting from the sale and/or licensing of the above mentioned device, versions of this device, associated intellectual property and/or any intellectual property developed associated with this device and/or versions of this device. Any development, funding or financial commitments required will be part of a separate agreement and negotiated at a later date. [Aferzon] further

agrees to promptly notify [MDS] of any compensation received for the above mentioned device, versions of the device, associated intellectual property and/or any intellectual property developed associated with this device and versions of this device. This agreement is limited to the above mentioned device, versions of this device, associated intellectual property and/or any intellectual property developed associated with this device and/or versions of this device. In signing this agreement, [Aferzon] agrees that he has not had prior contact with any company regarding this specific device and he is not under any contractual agreement with any other companies concerning this device."

Although the document provided that "[a]ny development, funding or financial commitments required will be part of a separate agreement and negotiated at a later date," the parties agree that no further written agreements were ever executed. The court instead found, as Lyons and Young both testified, that the parties agreed orally, on the same day they signed the written agreement, that MDS's obligation under the written agreement would be to create drawings and a prototype of the new device conceived by Aferzon "as a part [of] an effort to prove the concept" of the device.[1]

Lyons and Young promptly began to work on producing a prototype. Young explained that the creation of a medical device prototype proceeds in stages. It begins with sketches, moves on to the creation of digital design files known as computer aided design (CAD) files, and ultimately concludes with the manufacture of a prototype. Lyons testified that, because Aferzon's drawings did not include an adequate mechanism for rotating the blades within the cage, he and Young had to come up with such a mechanism themselves. Young thus prepared a series of sketches based on Aferzon's ideas and eventually came up with a "center shaft design" for rotating the blades, in which the rotating blades were attached to a single shaft that ran through the cage of the device. MDS then created multiple digital design files for a center shaft device and manufactured a prototype of the device using the center shaft design.

Lyons and Young further testified that the center shaft design prototype was tested in a cadaver at the University of Connecticut Health Center in Farmington either toward the end of 2004 or in early 2005. They also testified that Aferzon and Bash were present during the test at the health center when the device was successfully installed in a cadaver using an Allen wrench to rotate the blades into place. Although Aferzon and Bash both testified that they had no recollection of the cadaver test, the court credited the testimony of Lyons and Young on this subject.

After the cadaver test, MDS continued its work on the device, pivoting to a different design. Young began to work on a "rack and pinion"[2] design for the device

that was safer and more versatile than its predecessor, as it allowed the blades to be reversed more efficiently and prevented them from disengaging. Rather than utilizing a single central shaft on which all of the blades rotated, this second design utilized two geared shafts running through the cage, with three blades affixed to each of them on geared teeth. Lyons explained that the "blades had slots that had teeth that would mesh with the pinions. And, again, when you rotated the pinions, that would engage the rack and rotate the blades. . . . One [pinion] would rotate the three . . . blades in one direction . . . and the other pinion would rotate the blades in the opposite direction." From December, 2004, to May, 2005, MDS prepared and modified several digital design files for the device using the rack and pinion concept. Eventually, MDS produced a prototype of the rack and pinion design, which it gave to Aferzon no later than October, 2005. According to Lyons and Young, they spent nearly 100 hours working on Aferzon's idea.

In the meantime, Aferzon became dissatisfied with MDS's work and continued to work on development of the device on his own without informing MDS that he was doing so. Aferzon never communicated to MDS that he was dissatisfied with their prototype. Aferzon began to work on the device with his talented sixteen year old son, Joshua Aferzon, who was then taking a CAD class in school, on different blade designs and a mechanism to rotate the blades within the cage. Ultimately, on December 22, 2005, three months after the provisional patent based on his initial design sketches had expired in September, 2005, Aferzon applied for a patent on the device he and his son had been working on. This application, which was filed in the names of Aferzon and his son, described the subject matter of the proposed patent as an "apparatus and method for anterior intervertebral spinal fixation and fusion."

On February 26, 2006, Aferzon wrote to Lyons, seeking to amend his agreement with MDS: "I respectfully request that we amend the agreement dated November [4], 2004 . . . . As of the date of this letter there has not been sufficient progress on this project to warrant the continuation of this agreement. I understand that both parties have invested time and resources into this project and I am proposing that we determine a fair market value for the services that were provided by you." Lyons did not respond to this letter in writing, but he believed that he spoke with Aferzon about the letter.

In July, 2007, Aferzon and Bash formed and incorporated ISI. The two were equal owners of the company and agreed to split any income it generated equally between them. On February 27, 2008, and again in May, 2008, Lyons e-mailed Aferzon to request an update on the project. His first e-mail stated: "It's been some time since the last activity with the cage. Have you aban-

doned? If so, I would consider a buyout. If not, let's discuss next steps." His second e-mail stated: "Would you consider selling your percentage of the subject device? We have not seen any activity and would like to continue developing." Aferzon did not respond to either e-mail. In the same month that Lyons sent his second e-mail, however, on May 9, 2008, Aferzon and his son assigned their ownership interest in their pending patent application to ISI without informing the plaintiff of their actions.

Because Aferzon and Bash were busy with their medical practices, they began to seek a business and engineering partner to help ISI bring their anterior spinal fusion device to market. On May 29, 2009, Aferzon and his son received notice that their application for a patent on that device, which had been assigned to ISI, had been approved by the patent office and would shortly issue. Thereafter, on June 19, 2009, ISI entered into a cross license agreement with Alphatec Spine, Inc. (Alphatec), a medical device manufacturer, which allowed Alphatec to develop and sell any medical devices that, in the absence of the license agreement, would "infringe a [v]alid [c]laim of the [l]icensed ISI [p]atents." In exchange, ISI would receive an initial payment of 260,000 shares of Alphatec common stock and quarterly minimum royalty payments, a percentage of royalty payments over the minimum, and certain milestone payments triggered by aggregate sales figures. This was the only license agreement between ISI and Alphatec. On September 29, 2009, the patent office issued patent number 7,594,932 on an "apparatus for anterior intervertebral spinal fixation and fusion," listing Aferzon and his son as its inventors and ISI as their assignee.

After the patent was cross licensed to Alphatec, Aferzon and Bash worked with Alphatec to develop a spinal fusion device based on the patented design with the trade name "Solus," which Alphatec began marketing in 2011. Pursuant to the royalty schedule in the cross license agreement, Alphatec sent ISI a series of thirty-four distinct royalty payments between June, 2010, and August, 2019, including the initial payment in shares of Alphatec common stock. In addition to the royalty payments, Alphatec also sent ISI a payment of $50,000 that was intended to reimburse it for expenses it had incurred in developing and patenting the anterior spinal fusion device. These payments, including the cash value of the initial payment in Alphatec common stock and the expense reimbursement payment, totaled $3,274,578.[3] The defendants never notified the plaintiff that they had received any compensation for the sale and/or licensing of their anterior spinal fusion device.

In late summer or early fall of 2017, the plaintiff eventually became aware that Aferzon had developed a spinal fusion device that had been patented, assigned,

marketed and become profitable, when Lyons visited his physical therapist in Middletown, whose practice was adjacent to Bash's office. The physical therapist told Lyons during that visit that Bash had been traveling and teaching surgeons how to use a successful medical device. Lyons knew that Aferzon and Bash had worked together previously on the original spinal fusion device that was the subject of Aferzon's agreement with MDS. Notice of Bash's involvement in teaching the use of a similar device prompted the plaintiff to retain counsel. The plaintiff's counsel sent letters to Aferzon on November 24, 2017, and February 6, 2018, requesting that Aferzon inform the plaintiff if he had sold or licensed the device on which MDS had been working, whether he had received any compensation for the device, and if he owned any intellectual property associated with the device. Aferzon did not respond to either letter.

The plaintiff commenced this action on July 16, 2018, and filed its initial complaint in the Superior Court on July 19, 2018. Thereafter, in its operative substitute complaint dated March 6, 2019, the plaintiff asserted claims against the defendants of breach of contract and unfair trade practices in violation of CUTPA. The defendants filed their answer and special defenses to the operative complaint on April 5, 2019, denying the plaintiff's material allegations against them and asserting various special defenses, including that the plaintiff's claims were barred by applicable statutes of limitations.[4] Ultimately, on October 22, 2019, the plaintiff replied to the defendants' special defenses by denying them and pleading, in avoidance of the defendants' statutes of limitations defenses, that neither of its claims was barred by an applicable statute of limitations because the running of all statutes of limitations had been tolled under the fraudulent concealment doctrine and/or the continuing course of conduct doctrine.

In the meantime, on June 13, 2019, the plaintiff filed an application for a prejudgment remedy. The court held an initial evidentiary hearing on the application for a prejudgment remedy on September 18, 2019. Thereafter, however, on November 12, 2019, the parties agreed to convert the prejudgment remedy hearing into a full bench trial on the merits of the parties' claims and special defenses, and thus to continue with the presentation of evidence. The trial took place over the course of seven days, including the initial day of evidence at the prejudgment remedy hearing, and ended with the presentation of closing arguments on March 6, 2020.

The court issued its memorandum of decision on April 22, 2020, rendering partial judgment for the plaintiff on both of its claims. On the plaintiff's breach of contract claim, the court awarded $1,587,289 in expectation damages and $475,813.80 in statutory prejudgment interest through May 4, 2020, pursuant to General

Statutes § 37-3a. On the plaintiff's CUTPA claim, the court declined to award either punitive damages or additional expectation damages but ruled that the plaintiff was nonetheless entitled to recover its attorney's fees in an amount to be determined at a later date.

In reaching its decision, the court first considered whether the parties had entered into an enforceable contract. The court concluded that the agreement embodied in the document signed by Lyons and Aferzon on November 4, 2004, as supplemented by their contemporaneous oral agreement as to the plaintiff's obligations under the agreement, was sufficiently definite to form a binding contract between them, as there was nothing conditional in that agreement, so supplemented.

After confirming the existence of a contract, the court considered whether the patented anterior spinal fusion device that the defendants cross licensed to Alphatec was a "version" of the device that MDS had worked on pursuant to the November 4, 2004 agreement, in which case MDS would be entitled to receive 50 percent of all compensation resulting from the sale and/or licensing of the patented device. The defendants made three arguments on this issue: (1) that the patented device was not a version of the device that MDS had worked on pursuant to the parties' compensation-sharing agreement of November 4, 2004, (2) that the compensation so generated was paid to ISI, not to Aferzon, so it was not subject to sharing with the plaintiff under the November 4, 2004 agreement, and (3) that substantial expenses incurred by the defendants to develop the patented device significantly reduced the profits generated by the sale and/or licensing of that device.[5] The court first found that the patented device was a version of the device for which MDS had created design drawings and a prototype for Aferzon. As to the second argument, the court found that ISI was founded as part of an "intentional plan to try to avoid liability to MDS in bad faith," and thus that ISI was liable to MDS under the doctrine of successor liability. Finally, the court found that, although the defendants' account of the expenses they had incurred for development of the patented device generally was not credible, they credibly established that the initial $50,000 payment that ISI received from Alphatec on October 1, 2009, was not compensation resulting from the sale and/or licensing of the patented device but a reimbursement for development expenses that they had incurred to obtain the patent for that device.[6] The court thus ruled that the plaintiff was not entitled to recover 50 percent of that $50,000 reimbursement payment as damages for breach of the agreement. Accordingly, the court ruled that the plaintiff was entitled to recover 50 percent of all payments that ISI had received from Alphatec except for the $50,000 reimbursement payment.

The court next considered whether the plaintiff's

claims were barred by applicable statutes of limitations.[7] Because the defendants had received compensation from Alphatec resulting from the sale and/or licensing of the patented device from 2010 to 2019, but the plaintiff did not learn that it had a valid cause of action against the defendants for their failure to share such compensation with it until 2017, the statute of limitations could have had a significant impact on the plaintiff's recovery in this case. Concluding, however, that the running of any applicable statute of limitations had been tolled by both the fraudulent concealment doctrine and the continuing course of conduct doctrine, the court rejected the defendants' statute of limitations defense to the plaintiff's breach of contract claim without determining whether the three year or six year statute of limitations for contract actions applied to that claim. Accordingly, it concluded that the plaintiff was entitled to recover 50 percent of all thirty-four royalty payments that ISI had received from Alphatec from 2010 through 2019, including the initial payment in shares of Alphatec stock.

The court thus awarded the plaintiff $1,587,289 in expectation damages on its breach of contract claim plus $475,813.80 in prejudgment interest pursuant to § 37-3a, calculated for each unshared royalty payment at the rate of 4.5 percent per year on the plaintiff's 50 percent share of that payment, from the date the defendants received the unshared payment until May 4, 2020.[8]

The plaintiff also made claims for expectation damages, punitive damages, and attorney's fees and expenses under CUTPA. Although the court found that the defendants' repeated breaches of their contract with the plaintiff had been committed in bad faith, and thus constituted unfair trade practices in violation of CUTPA, it declined to award the plaintiff either punitive damages or additional expectation damages on the basis of such violations. Instead, it limited the plaintiff's right of recovery under CUTPA to the attorney's fees and expenses it reasonably incurred in prosecuting those claims, as authorized by General Statutes § 42-110g, in an amount to be determined at a later time.[9] On September 15, 2020, the court awarded the plaintiff $756,000 in attorney's fees and expenses. Finally, on September 21, 2020, the court rendered final judgment for the plaintiff after extending the end date for the calculation of prejudgment interest to that date, and recalculating the total amount of such prejudgment interest as $504,054. The court also determined that the plaintiff was entitled to recover postjudgment interest but reserved decision as to the amount of such interest until a later time.

Additionally, on October 10, 2019, before the parties agreed to convert the prejudgment remedy hearing into a full scale bench trial on the merits of their claims and

special defenses, the plaintiff filed a unified offer of compromise pursuant to General Statutes § 52-192a, offering to settle its claims against the defendants for $1,150,000. The defendants did not accept the offer. Accordingly, the court awarded the plaintiff offer of compromise interest of $90,968, a much lesser amount than the plaintiff claims it was statutorily entitled to in this case. The plaintiff has cross appealed from the court's judgment challenging the amount of the court's offer of compromise interest award. In the end, the court rendered final judgment for the plaintiff in the total amount of $2,938,311.

This appeal followed. Additional facts will be set forth as necessary.

I

THE DEFENDANTS' APPEAL

A

We first address the court's conclusion that the parties had an enforceable contract. The defendants argue that the written agreement signed by the parties was indefinite and that the court improperly used parol evidence to supplement its essential terms to form a contract. The plaintiff argues that the parol evidence rule does not apply to the written portion of the parties' agreement standing alone, and thus that it was not improper for the court to consider extrinsic oral evidence in interpreting it. We agree with the plaintiff.

As a preliminary matter, we set forth our standard of review. "The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence. . . . To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Tsionis* v. *Martens*, 116 Conn. App. 568, 576, 976 A.2d 53 (2009).

The following additional facts and procedural history are relevant to this issue. The court found that part of the contract between the parties was in writing and part of it was oral. The only part that was written was encapsulated in the document signed on November 4, 2004, which provided, in part, that "[a]ny development, funding or financial commitments required will be part of a separate agreement and negotiated at a later date." In light of the previously quoted language, the defendants argued before the court that the parties "merely agreed to make a contract at some future date and that there was nothing definite enough between them to

call a contract, especially because there was only an agreement to agree later about financial commitments." The court first rejected the defendants' argument that the document was only an "agreement to agree," finding that there was nothing conditional in the language of the agreement. The court next found that the essential terms of the agreement, that the plaintiff would create drawings and a prototype of the device and the defendants would pay the plaintiff 50 percent of the total compensation resulting from the sale and/or licensing of the device, were in fact agreed to on November 4, 2004, although the agreement as to the plaintiff's obligations was developed orally. There was substantial dispute over what the plaintiff's obligations were under the agreement, but the court credited the testimony of Lyons and Young over that of Aferzon. Thus, the court relied both on the writing signed by Lyons and Aferzon, and on the contemporaneous oral agreement between the parties as described by Lyons and Young as the basis for finding that the parties had formed a binding contract for MDS to build a prototype of Aferzon's device in exchange for 50 percent of all compensation received by Aferzon for the sale and/or licensing of that device or any version thereof. The court held that "the failure to provide specific terms about future financial commitments wasn't an essential term whose absence defeats the very existence of a contract for lack of definiteness."

1

We begin with the defendants' claim that the court improperly considered parol evidence in determining whether, and on what terms, the parties reached a definite, enforceable contractual agreement. The plaintiff argues that, because the agreement was not integrated, the parol evidence rule did not apply. We agree with the plaintiff.

"Because the parol evidence rule is not an exclusionary rule of evidence . . . but a rule of substantive contract law . . . the defendants' claim involves a question of law to which we afford plenary review." (Internal quotation marks omitted.) *Colliers, Dow & Condon, Inc.* v. *Schwartz*, 77 Conn. App. 462, 466, 823 A.2d 438 (2003).

"The parol evidence rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversation, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . . The parol evidence rule does not of itself, therefore, forbid the presentation of

parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract." (Internal quotation marks omitted.) *Ravenswood Construction, LLC* v. *F. L. Merritt, Inc.*, 105 Conn. App. 7, 14–15, 936 A.2d 679 (2007).

"Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. . . . These recognized exceptions are, of course, only examples of situations [in which] the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 277–78, 819 A.2d 773 (2003).

We first note that the court did not provide a justification for its consideration of extrinsic oral evidence because the defendants did not explicitly raise the parol evidence rule at trial, instead arguing primarily that the agreement was not binding in the first place. This does not preclude us from reviewing the issue. See *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 308, 900 A.2d 560 (2006) ("[t]he parol evidence rule . . . prohibits the introduction of evidence that varies or contradicts an exclusive written agreement whether or not there is an objection" (internal quotation marks omitted)).

It was permissible for the court to look to extrinsic evidence because the November 4, 2004 agreement was not integrated. "In order for the bar against the introduction of extrinsic evidence to apply, the writing at issue must be integrated, that is, it must have been intended by the parties to contain the whole agreement . . . ." (Citation omitted; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 503, 746 A.2d 1277 (2000); see 11 R. Lord, Williston on Contracts (4th Ed. May, 2021) § 33:14 ("The parol evidence rule applies only when the parties integrate their agreement, that is, when they mutually consent to a certain writing or writings as the final statement of the agreement or contract between them. . . . Only when an integrated contract

exists and its meaning differs from extrinsic evidence offered by one of the parties does the parol evidence rule come into play." (Footnotes omitted.)).

"Whether the written contract was actually the final repository of the oral agreements and dealings between the parties depends on their intention, evidence as to which is sought in the conduct and language of the parties and the surrounding circumstances. If the evidence leads to the conclusion that the parties intended the written contracts to contain the whole agreement, evidence of oral agreements is excluded, that is, excluded from consideration in the determination of the rights and obligations of the litigants, even though it is admitted on the issue of their intention. . . . A written agreement is integrated and operates to exclude evidence of the alleged extrinsic negotiation if the subject matter of the latter is mentioned, covered or dealt with in the writing . . . if it is not, then probably the writing was not intended to embody that element . . . . If the evidence, however, does not indicate that the writing is intended as an integration, i.e., a final expression of one or more terms of an agreement . . . then the agreement is said to be unintegrated, and the parol evidence rule does not apply." (Citations omitted; internal quotation marks omitted.) *Associated Catalog Merchandisers, Inc.* v. *Chagnon*, 210 Conn. 734, 739–40, 557 A.2d 525 (1989).

The written portion of the November 4, 2004 agreement, which includes *no* obligation on the part of the plaintiff and explicitly states that another agreement will be negotiated, is clearly not a final repository of the parties' dealings. The agreement itself demonstrates that the parties did not intend for it to "completely embody the contract between the parties." 11 R. Lord, supra, § 33:15. The defendants argue that integration must be assessed on an issue-by-issue basis and that the agreement was "integrated with respect to the issue of [the plaintiff's] development commitments insofar as it provides that those commitments would be the subject of a separate agreement to be negotiated at a later date." The defendants rely on language from *Cohn* v. *Dunn*, 111 Conn. 342, 149 A. 851 (1930), stating that, if a "particular element of the alleged extrinsic negotiation" is "mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transactions on that element . . . ." (Internal quotation marks omitted.) Id., 347; see also *Associated Catalog Merchandisers, Inc.* v. *Chagnon*, supra, 210 Conn. 740. But, in the present case, the "particular element of the alleged extrinsic negotiation" that the court relied on was that the plaintiff "was to create drawings and a prototype as a part [of] an effort to prove the concept . . . ." Again, the agreement states that "[a]ny development, funding or financial commitments required will be part of a separate agreement and negotiated at a later date." It cannot be said that the agreement was

integrated as to the plaintiff's obligations when the sentence in question does not mention the plaintiff but merely that any development commitments will be negotiated at a later date.

The defendants also argue that the extrinsic evidence indicating that on the same day that the parties signed the written agreement they orally decided what the plaintiff's obligation would be thereunder varies from or contradicts the provision stating that such an agreement would be negotiated at a later date, and thus violates the parol evidence rule. That prohibition, however, only applies if the document is integrated. See *Weiss* v. *Smulders*, 313 Conn. 227, 249, 96 A.3d 1175 (2014) (explaining that parol evidence rule forbids only use of evidence outside four corners of *integrated* contract " 'to vary or contradict the terms of such a contract' "). Because the document was not integrated, the court did not err in considering extrinsic evidence to determine whether there was a contract and, if so, what the parties' obligations were agreed to be thereunder.

2

Having concluded that it was not improper for the court to consider extrinsic oral evidence when determining if the parties entered into an enforceable contract, we next consider the correctness of the court's substantive conclusion that the parties' written agreement and contemporaneous oral agreement amounted to an enforceable contract.

"In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make." (Internal quotation marks omitted.) *Tsionis* v. *Martens*, supra, 116 Conn. App. 577. "Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements. . . . [W]here the memorandum appears [to be] no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms, the plaintiff has failed to prove the existence of an agreement." (Citations omitted; internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 51, 873 A.2d 929 (2005). "So long as any essential matters are left open for further consideration, the contract is not complete." (Internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 535, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999). Additionally, we reiterate that our review is limited to deciding whether the court's findings of fact were clearly erroneous. See, e.g., *Tsionis* v. *Martens*, supra, 576.

The defendants argue that the November 4, 2004 agreement was "indefinite on its face" as to an essential term, the plaintiff's obligations, and that the document was never finalized into an enforceable agreement. We have already concluded, however, that it was permissible for the court to look beyond the face of the document when making this determination, and the court's conclusion that the parties had a contract was premised on a factual finding that the plaintiff's obligations were orally agreed to on the same date that the document was signed. There is ample support in the record for this factual finding in the testimony of Lyons. The extent to which the parties agreed on the plaintiff's obligation was disputed at trial, but the court's factual finding that there was an agreement between them was based on a determination that the plaintiff's version of events was more credible than the defendants' version. "It is well established that [t]his court will not revisit credibility determinations. . . . The court was entitled, in its role as sole arbiter of credibility to discredit the [defendants' testimony]." (Citation omitted; internal quotation marks omitted.) *Sapper* v. *Sapper*, 109 Conn. App. 99, 108–109, 951 A.2d 5 (2008). Thus, in light of the court's credibility findings, we cannot conclude that the court's subsequent finding that the essential contract terms were agreed to on November 4, 2004, was clearly erroneous. The court appropriately concluded that the parties had an enforceable contract.

B

We next address the court's conclusion that the patented device was a version of the device depicted in Aferzon's initial design sketches, thus entitling the plaintiff to 50 percent of all compensation resulting from the sale and/or licensing of that device. The defendants argue that the court misinterpreted the contract by disregarding important contractual language in it and failing to conduct an appropriate analysis under federal patent law. The plaintiff argues, in response, that the court properly analyzed the contractual language and that no analysis under federal patent law was necessary. We agree with the plaintiff.

We begin by setting forth the standard of review and legal principles relevant to this claim. "The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact [subject to the clearly erroneous standard of review] . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 575, 119 A.3d 570 (2015).

The defendants do not challenge any of the court's

factual findings on this matter or the court's ultimate determination that the defendants breached that agreement, which would be reviewed for clear error. See, e.g., *Efthimiou* v. *Smith*, 268 Conn. 487, 493–94, 846 A.2d 216 (2004). Instead, the defendants challenge only the manner in which the court interpreted the contract.[10] In light of the fact that the defendants' claim is largely directed at the court's interpretation of the agreement, as opposed to the court's factual findings, "our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Sun Val, LLC* v. *Commissioner of Transportation*, 330 Conn. 316, 325–26, 193 A.3d 1192 (2018). Additionally, a plenary standard of review is appropriate in light of the fact that neither party has argued that the contractual language at issue is ambiguous. *Nationwide Mutual Ins. Co.* v. *Allen*, 83 Conn. App. 526, 537, 850 A.2d 1047 (explaining that, "in the absence of a claim of ambiguity, the interpretation of [a] contract presents a question of law"), cert. denied, 271 Conn. 907, 859 A.2d 562 (2004).

"It is the general rule that a contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties." (Internal quotation marks omitted.) *Bank of Boston Connecticut* v. *Scott Real Estate, Inc.*, 40 Conn. App. 616, 621, 673 A.2d 558, cert. denied, 237 Conn. 912, 675 A.2d 884 (1996). "A contract is to be construed as a whole and all relevant provisions will be considered together. . . . In giving meaning to the terms of a contract, we have said that a contract must be construed to effectuate the intent of the contracting parties. . . . The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Citation omitted; internal quotation marks omitted.) *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 356–57, 727 A.2d 1260 (1999).

The following additional facts and procedural history are relevant to this issue. We repeat that the written

portion of the parties' November 4, 2004 agreement, as signed by Lyons and Aferzon, provided: "Joseph Aferzon (inventor/owner of above stated invention) agrees that [MDS] will receive 50% of the total compensation resulting from the sale and/or licensing of the above mentioned device, versions of this device, associated intellectual property and/or any intellectual property developed associated with this device and/or versions of this device. . . . This agreement is limited to the above mentioned device, versions of this device, associated intellectual property and/or any intellectual property developed associated with this device and/or versions of this device." The defendants argued before the court that the patented device, whose sale and/or licensing generated all compensation that the plaintiff claims a contractual right to share, was not covered by the parties' agreement.[11]

The court made the following factual findings before reaching its ultimate conclusion that the patented device was covered by the agreement: "Like the [plaintiff's] prototype, the patent applied for was for an anterior intervertebral spinal fixation and fusion apparatus. The versions illustrated in the patent have a cage and preloaded, oppositely rotating blades that the court is convinced began with Aferzon's crude sketch and then bear the mark of [the plaintiff's] work on the nature of the cage, the shape of the blade and . . . the preloading of those blades into the cage in substitution for Aferzon's original idea of adding them to the cage later. There are differences between the prototype and what appears in the patent application—principally a square actuating nut that Aferzon makes much of and may [accurately] be [attributed] to his son—but [the court] cannot pretend after seeing the patent drawings that what appears in them is not—as the contract says—a 'version' of the same device Aferzon promised to partner with [the plaintiff] on."

In reaching the conclusion that the patented device was a version of the device covered by the agreement, the court interpreted the agreement in three important ways. First, the court concluded that the agreement was "intentionally broad," and thus that it covered "related" devices and "the associated intellectual property with any 'related' device." The court then significantly based its analysis on whether the patented device was "related" to the device contemplated in the agreement. Second, the court compared Aferzon's initial design sketches to the drawings and figures in the patent application. Third, the court compared the plaintiff's prototype to the drawings and figures in the patent application. Ultimately, the court concluded: "[T]his matter all started with a crude sketch from Aferzon. Without charge, [the plaintiff] turned that crude sketch into drawings and a prototype that was tested on a cadaver. That device was unquestionably an anterior intervertebral spinal fixation and fusion apparatus. Before any

other prototype was created, Aferzon described in a patent application an anterior intervertebral spinal fixation and fusion apparatus that included a cage and blades sufficiently similar to what [the plaintiff] worked on for the court to find the device described in the patent to be 'related' to the device [the plaintiff] drew and prototyped. . . . All we have to do to see the relationship is to look at the drawings beginning with Aferzon's and ending with those in the patent application to see that they are at a minimum the same basic idea— a sturdy cage with oppositely rotating sets of blades to be inserted between the vertebrae. From that, you can see that they are at least 'related.' 'Related' only means having a 'relation' which itself means having 'an aspect or quality (such as a resemblance) that connects two or more things or parts as being or belonging or working together or as being of the same kind.' The MDS prototype and the device described in the patent are 'of the same kind.' . . . They are 'related' for purposes of the agreement. And from this patent is a direct path to the money." (Footnote omitted.)

We now turn to the defendants' arguments on appeal. The defendants first claim that the court erred by analyzing whether the patented device was "related" to the device contemplated in the agreement, arguing that the court "inserted that term into the contract" and "plainly failed to apply the actual language used by the parties in its decision." The defendants argue that the court instead should have strictly analyzed whether the licensed patent was "intellectual property *associated with*" the device in Aferzon's initial drawings or a "*version* thereof." (Emphasis added; internal quotation marks omitted.) The defendants are correct that the written portion of the agreement does not contain the word "related," but, although the court's memorandum of decision does not explicitly say so, we infer that the court's usage of that word reflects the court's interpretation of the agreement's operative language. We will not presume that the court misread the contract, particularly when the court elsewhere used the language of the contract in stating that "[the court] cannot pretend after seeing the patent drawings that what appears in them is not—as the contract says—a '*version*' of the same device Aferzon promised to partner with [the plaintiff] on." (Emphasis added.)

The court's usage of "related" in interpreting the contract was not improper for two reasons. First, the defendants make much of the dictionary definitions of "associated" and "related," which the court cited, arguing that the supposedly broader definition of "related" tainted the analysis. "We often consult dictionaries in interpreting contracts . . . to determine whether the ordinary meanings of the words used therein are plain and unambiguous, or conversely, have varying definitions in common parlance." (Internal quotation marks omitted.) *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 193,

112 A.3d 144 (2015). The online version of the Merriam-Webster Dictionary that the defendants cite, however, also defines "associated" as "*related*, connected, or combined together." (Emphasis added.) Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/associated (last visited September 17, 2021). The print version of Merriam-Webster's Collegiate Dictionary defines "associated"[12] as "to join or connect together," "to bring together or into *relationship* in any of various intangible ways"; (emphasis added) Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 75; and "related" as "connected by reason of an established or discoverable relation." Id., p. 1050. Random House Webster's Unabridged Dictionary provides similar definitions, defining "associate" as "to connect or bring into *relation*"; (emphasis added) Random House Webster's Unabridged Dictionary (2d Ed. 2001) p. 126; and "related" as "associated; connected." Id., p. 1626. We are not convinced that the "common, natural, and ordinary meaning and usage" of "related" is significantly broader than "associated," as the defendants contend. See *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, supra, 248 Conn. 357.

Second, even if the definition of "related" is broader than the definition of "associated," the interpretation of this contract is not as simple as defining the word "associated" and asking whether the two devices are "associated" with one another. The sentence in question is clearly broader than that, covering "versions of this device" and "any intellectual property developed associated with this device and/or versions of this device." The upshot of this wording is that the agreement can cover versions of the device or intellectual property, subsequently developed, that is associated with *versions* of the original device, not just directly associated with the original device. The court's usage of "related" results from a proper interpretation of this clause, which the court accurately described as "intentionally broad."

The defendants next claim that the court improperly relied on the drawings and figures contained in the defendants' patent. Specifically, the defendants argue that it was improper for the court to determine if the idea in the patent was "related" to the idea referenced in the parties' agreement by comparing Aferzon's 2004 sketches to the figures in the patent application and the subsequent patent. Instead, the defendants argue, the court should have looked to the "claims" in the patent, which is the well established standard by which claims of patent infringement are analyzed.[13] They thus argue that "the trial court's analysis in this respect is legally erroneous because the intellectual property that ISI licensed to Alphatec is not measured by the patent's drawings, but by its *claims*." (Emphasis in original.) The defendants are correct that the extent of the intellectual property licensed to Alphatec would be measured by

the patent's claims,[14] but "a contract must be construed to effectuate the intent of the contracting parties." (Internal quotation marks omitted.) *HLO Land Owner-ship Associates Ltd. Partnership* v. *Hartford*, supra, 248 Conn. 356. There is nothing in the parties' agreement that suggests that they intended that a claims analysis be the method used to determine if a subsequent device was a version of the original device as to which the plaintiff was entitled to receive 50 percent of the total compensation resulting from its sale and/or licensing. Additionally, the scope of the patented invention and its subsequent license to Alphatec is simply not relevant to the analysis of whether the device is covered by the contract. This was the only patent that ISI ever licensed to Alphatec, and there is no question that the license generated compensation. The determinative question is whether the device that was patented and licensed is a version of the 2004 device or is intellectual property that was developed and associated with a version of the device. The scope of the patent has no bearing on that question. The defendants can cite to no authority, nor have we identified any, that suggests that a state court must resolve a contractual dispute over patent license profits by looking to federal patent law or a claims analysis. Lastly, we note that the court did not rely solely upon the figures in the patent, for it mentioned several times what was "described" in the patent. Accordingly, it was not improper for the court to determine if the devices were related by looking at the figures in the patent.

Finally, the defendants argue that the court erred by comparing the plaintiff's prototype and drawings with the figures in the patent, contending that "all of the parties agreed that the 'device' referenced in the November 4, 2004 agreement is the one contained in Aferzon's hand drawings that he filed as a provisional patent application. . . . [The plaintiff's] drawings and prototypes were created later and are not what the [agreement] is referring to in reciting 'this device.' " (Citations omitted.) The defendants' argument fails for two reasons. First, the court's decision makes clear that it considered the plaintiff's prototype to be a link in the chain going from the initial drawings to the Solus, but ultimately the decision rested on comparing the initial device to the patented device.[15] Second, the agreement clearly allows for consideration of the prototype. The defendants are correct that both Lyons and Aferzon testified that the "device" referenced in the agreement is that which is depicted in Aferzon's initial design sketches. When the agreement states that the plaintiff is entitled to 50 percent of the total compensation resulting from the sale and/or licensing of the "above mentioned *device*, [or] versions of *this device*," that portion of the agreement refers to Aferzon's initial design sketches. (Emphasis added.) The latter portion of the sentence, however, covers "intellectual property

developed associated with this device and/or versions of this device." We read this portion of the agreement to cover intellectual property developed that is associated with *versions* of the device. Therefore, the court was not limited to considering the initial device but could also consider later versions of the initial device. The court thus looked at the prototype as just one link in a chain leading from the initial design sketches to the patent: "[T]his matter all started with a crude sketch from Aferzon. . . . [The plaintiff] turned that crude sketch into drawings and a prototype that was tested on a cadaver. That device was unquestionably an anterior intervertebral spinal fixation and fusion apparatus. Before any other prototype was created, Aferzon described in a patent application an anterior interverte- bral spinal fixation and fusion apparatus that included a cage and blades sufficiently similar to what [the plain- tiff] worked on for the court to find the device described in the patent to be 'related' to the device [the plaintiff] drew and prototyped." Because the court found the prototype to be related to Aferzon's initial design sketches, it was not improper for the court to consider the prototype as part of its analysis.

We find no error in the manner in which the court interpreted the contract, and the court's factual finding that the patented device is a version of the initial device stands unchallenged. Accordingly, we conclude that the court properly determined that the licensed patent and the device based on it are within the scope of the agree- ment.

### C

The defendants next claim that the court improperly concluded that any applicable statute of limitations applicable to the plaintiff's claims had been tolled, allowing the plaintiff to recover 50 percent of all com- pensation resulting from the sale and/or licensing of the patented device, dating back to 2010. The defen- dants argue that neither the fraudulent concealment doctrine nor the continuing course of conduct doctrine applies to the plaintiff's claims as a matter of law. The plaintiff argues that the court correctly concluded that both doctrines apply. We agree with the defendants.

We begin by setting forth the applicable standard of review. "Whether a particular action is barred by the statute of limitations is a question of law to which we apply a plenary standard of review." *Federal Deposit Ins. Corp.* v. *Owen*, 88 Conn. App. 806, 814, 873 A.2d 1003, cert. denied, 275 Conn. 902, 882 A.2d 670 (2005).

The following additional facts and procedural history are relevant to this claim. The defendants pleaded and argued before the court that the plaintiff's claims were barred by applicable statutes of limitations. As the court explained, this special defense could have had a signifi- cant impact on the plaintiff's right of recovery because

the defendants had first received compensation from Alphatec for the sale and/or licensing of the patented device as early as 2010: "As our Supreme Court explained in [*Polizos* v. *Nationwide Mutual Ins. Co.*, 255 Conn. 601, 608–609, 767 A.2d 1202 (2001)], whatever the limitation period is, it ordinarily begins to run, not when the breach is discovered, but instead from the breach itself, that is, from 'the time when the plaintiff first could have successfully maintained an action.' This poses a problem for [the plaintiff] because here, the first breach of the agreement that could have justified a lawsuit was in 2010, and this lawsuit wasn't filed until 2018." The court declined, however, to rule on which statute of limitations applied to the plaintiff's cause of action for breach of contract on the basis of its conclusion that the running of either statute would have been tolled under either the fraudulent concealment doctrine or the continuing course of conduct doctrine. By so ruling, the court rejected the defendants' special defense under the applicable statute of limitations and held that the plaintiff was entitled to recover damages from the defendants for all royalty payments they had received for the sale and/or licensing of the patented device but had not shared with the plaintiff since the first royalty payment was received by them in 2010. We will address each doctrine in turn.

1

We first address the court's conclusion that the fraudulent concealment doctrine tolled the running of the statute of limitations as to the defendants' cause of action for breach of contract. The fraudulent concealment doctrine is codified in General Statutes § 52-595, which provides: "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."

"The question before us is whether the [plaintiff] [has] adduced any credible evidence that any of the defendants fraudulently concealed the existence of the [plaintiff's] cause of action. To meet this burden, it was not sufficient for the [plaintiff] to prove merely that it was more likely than not that the defendants had concealed the cause of action. Instead, the [plaintiff] had to prove fraudulent concealment by the more exacting standard of clear, precise, and unequivocal evidence. . . . Under our case law, to prove fraudulent concealment, the [plaintiff] [was] required to show: (1) a defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the [plaintiff's] cause of action; (2) that defendant's intentional concealment of these facts from the [plaintiff]; and (3) that defendant's concealment of the facts for the purpose of obtaining delay on the [plaintiff's] part in filing a com-

plaint on their cause of action." (Citations omitted; internal quotation marks omitted.) *Bartone* v. *Robert L. Day Co.*, 232 Conn. 527, 532–33, 656 A.2d 221 (1995). "[Additionally], the [defendants'] actions must have been directed to the very point of obtaining the delay [in filing the action] of which [the defendants] afterward [seek] to take advantage by pleading the statute." (Internal quotation marks omitted.) *Carson* v. *Allianz Life Ins. Co. of North America*, 184 Conn. App. 318, 326, 194 A.3d 1214 (2018), cert. denied, 331 Conn. 924, 207 A.3d 27 (2019).

In concluding that the defendants had fraudulently concealed the cause of action for breach of contract from the plaintiff, the court first explained that the "pertinent fact here was that Aferzon was making money on the device and not sharing it with [the plaintiff]. That first happened in 2010 when the ISI license to Alphatec resulted in the transfer of shares of Alphatec stock." The court then focused on the following actions of the defendants, which it found to constitute fraudulent concealment: (1) failing to inform the plaintiff whenever money was earned from the sale of the device, despite their contractual duty to so inform it under the agreement, (2) the 2006 letter that Aferzon sent to Lyons claiming that the project was dormant and seeking to amend the agreement, in which the court found that Aferzon "intentionally chose, not only to conceal the facts from [the plaintiff], but to lie about the status of the project and put [the plaintiff] off its guard," (3) Aferzon's failure to respond to the two e-mails that Lyons sent to him in 2008 requesting an update on the project, (4) Aferzon's and Bash's transfer of their rights in the patent to a limited liability company, (5) and Aferzon's failure to respond to the two presuit letters that the plaintiff's counsel sent to him in 2017 and 2018.[16] Ultimately, the court concluded that "[t]he key factors permitting tolling for fraudulent concealment under the common law are all in place. [The plaintiff] diligently and repeatedly tried to discover from Aferzon—the most direct possible source—the status of the project. Aferzon knew the pertinent fact: the device was making money. Aferzon intentionally concealed that fact from [the plaintiff]. And not only did he conceal it, he deliberately threw [the plaintiff] off the scent by telling [it] the project wasn't making sufficient progress to warrant continuing his deal with [the plaintiff]. The court infers from this conduct that Aferzon was intentionally concealing this information from [the plaintiff] so that he might postpone the reckoning of a lawsuit for as many years as possible and, if possible, until it was too late. . . . Tolling under the doctrine of fraudulent concealment applies to the [plaintiff's] claims through the time [the plaintiff] first learned the facts needed to support a claim." (Footnote omitted.)

The trial court's conclusion is legally erroneous for two reasons. First, five of the six factual predicates on

which the court relied legally cannot constitute fraudulent concealment because they occurred either before the plaintiff's cause of action accrued or after the plaintiff had become aware of that cause of action. To prove fraudulent concealment, the plaintiff must demonstrate the defendant's *actual awareness* of the facts necessary to establish the plaintiff's *cause of action* and its intentional concealment of these facts. See *Bartone* v. *Robert L. Day Co.*, supra, 232 Conn. 533. The court found, and neither party has challenged, that "the first breach of the agreement that could have justified a lawsuit was in 2010" when ISI first received a royalty payment from Alphatec in the form of a transfer of Alphatec common stock. Aferzon's letter in which he lied about the dormancy of the project, Lyons' two e-mails that Aferzon failed to respond to, and Aferzon's transfer of his patent rights to the ISI all occurred before any breach had occurred. The facts necessary to establish the cause of action did not exist when those events occurred, so it was impossible at those times for Aferzon either to have had actual awareness of the plaintiff's nonexistent cause of action for breach of contract or to have intentionally concealed such a cause of action from the plaintiff. See *Flannery* v. *Singer Asset Finance Co., LLC*, 128 Conn. App. 507, 517, 17 A.3d 509 (2011) (explaining that merely concealing existence of wrongdoing is insufficient to establish that defendant fraudulently concealed existence of plaintiff's causes of action with intention of delaying plaintiff in commencing lawsuit), aff'd, 312 Conn. 286, 94 A.3d 553 (2014). As for the two presuit letters sent by the plaintiff's counsel to Aferzon, to which Aferzon failed to respond, the trial court explicitly found that the plaintiff had already learned the facts necessary to establish a cause of action for breach of contract by the time those letters were mailed.[17] The statute of limitations can no longer be tolled from fraudulent concealment once the plaintiff has sufficient knowledge of the cause of action, as § 52-595 provides that the cause of action accrues once "the person entitled to sue thereon first discovers its existence."

As for the remaining factual predicate on which the court relied as a basis for finding fraudulent concealment, that Aferzon failed to notify the plaintiff whenever ISI received compensation resulting from the sale and/or licensing of the patented device, such conduct merely constituted nondisclosure, which, standing alone, cannot establish fraudulent concealment in the absence of a fiduciary duty. Generally, fraudulent concealment requires a showing of affirmative acts of concealment. See *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, 89 Conn. App. 459, 478, 874 A.2d 266 (2005), aff'd, 281 Conn. 84, 912 A.2d 1019 (2007). The defendants acknowledge that "[o]nly in the context of a fiduciary relationship is there a *possible* exception where nondisclosure may suffice." (Emphasis added.) The plaintiff

describes the exception more definitively, stating that "a plaintiff may be able to prove the second 'intentional concealment' element by showing that 'a defendant owed him a fiduciary duty and failed to disclose information as that duty required.'" The defendants are closer to the mark, as our Supreme Court has not held that, in the context of a fiduciary relationship, mere nondisclosure can satisfy the second element of fraudulent concealment. See *Iacurci* v. *Sax*, 313 Conn. 786, 792 n.8, 99 A.3d 1145 (2014); *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 107–108, 912 A.2d 1019 (2007). In *Iacurci*, commenting on a trial court's citation to *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 107, for the proposition that "nondisclosure is sufficient to satisfy the second element of fraudulent concealment when the 'defendant has a fiduciary duty to disclose those facts'"; *Iacurci* v. *Sax*, supra, 791–92; our Supreme Court explained its view of the controlling law as follows: "This quotation cites a proposition that has gained general acceptance in federal cases applying Connecticut law. See, e.g., *Fenn* v. *Yale University*, 283 F. Supp. 2d 615, 636–37 (D. Conn. 2003). As the trial court acknowledged, however, this court has 'not yet decided whether affirmative acts of concealment are always necessary' to satisfy the second element of fraudulent concealment under § 52-595. . . . *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 107. The trial court nonetheless proceeded as though a fiduciary's mere nondisclosure, if found, could supplant the need for evidence of acts of intentional concealment. The Appellate Court followed a similar course. See *Iacurci* v. *Sax*, [139 Conn. App. 386, 394 n.2, 57 A.3d 736 (2012)]. We emphasize that, in *Falls Church Group, Ltd.*, this court only explained, in the context of evaluating a vexatious litigation action, that a law firm had probable cause to believe that it could assert a fraudulent concealment claim in light of federal precedent allowing fiduciary nondisclosure to substitute for intentional concealment. *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 103–105, 107–108, 112. That is, in *Falls Church Group, Ltd.*, this court did not actually *adopt* the federal approach of allowing fiduciary nondisclosure to substitute for the second element of a fraudulent concealment claim. Nor do we adopt the federal approach in the present case, as the parties have not brought it directly into dispute. Rather, in the present case, we will assume without deciding that a fiduciary's nondisclosure could satisfy the second element of fraudulent concealment for the purpose of § 52-595." (Emphasis in original.) *Iacurci* v. *Sax*, supra, 792 n.8.

Our Supreme Court has not revisited this issue since *Iacurci*. "It is axiomatic that this court, as an intermediate body, is bound by Supreme Court precedent and [is] unable to modify it . . . . [I]t is not within our

province to reevaluate or replace those decisions." (Internal quotation marks omitted.) *Coyle Crete, LLC* v. *Nevins*, 137 Conn. App. 540, 560–61, 49 A.3d 770 (2012). Accordingly, we follow our Supreme Court's lead and assume without deciding that a fiduciary's nondisclosure *could* satisfy the second element of fraudulent concealment. Here, however, the trial court never held that Aferzon owed the plaintiff a fiduciary duty.[18] In the absence of such a duty, our Supreme Court's guidance supports the conclusion that mere nondisclosure paired with an ordinary contractual duty to disclose is insufficient to establish fraudulent concealment. *Iacurci* v. *Sax*, supra, 313 Conn. 792 n.8. The plaintiff argues, however, that the "[d]efendants . . . cite no binding authority holding that the second element of fraudulent concealment cannot also be proven by showing that a defendant intentionally, and for the specific purpose of delaying a plaintiff filing a complaint, violated an express contractual duty to disclose." The plaintiff is correct, but our review of the case law also confirms the contrary proposition—that no Connecticut court has ever found nondisclosure sufficient to toll the statute of limitations in the absence of a fiduciary relationship. Given that our Supreme Court has declined to hold that nondisclosure is sufficient *even with* a fiduciary duty; see *Iacurci* v. *Sax*, supra, 792 n.8; we decline to rule that violation of a contractual duty to disclose in the absence of a fiduciary duty is sufficient to constitute fraudulent concealment.

We stress that the statute in question tolls the statute of limitations when a defendant "*fraudulently* conceals from [the plaintiff] the existence of the cause of such action . . . ." (Emphasis added.) General Statutes § 52-595. Merriam-Webster's Collegiate Dictionary defines fraudulent as "characterized by, based on, or done by fraud . . . ." Merriam-Webster's Collegiate Dictionary, supra, p. 498; *Rivers* v. *New Britain*, 288 Conn. 1, 17, 950 A.2d 1247 (2008) (explaining that we look to dictionary definition of term to ascertain its commonly approved meaning in statutory interpretation). Fraud is defined as "deceit, trickery; intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right; an act of deceiving or misrepresenting . . . ." Merriam-Webster's Collegiate Dictionary, supra, p. 498. The defendants' failure to notify the plaintiff that the sale or licensing of the patented device had resulted in compensation was simply a breach of the agreement. There is no act of deceit, misrepresentation, or "perversion of truth" inherent in such conduct. Other than the actions discussed previously, which occurred before the plaintiff's cause of action for breach of contract accrued, the plaintiff can point to no evidence of additional fraudulent behavior by the defendants other than their repeated breaches of the agreement. Our review of the relevant case law and statutory language leads us to conclude that, in

the absence of a fiduciary duty, there must be some fraudulent action beyond breaching one's contractual duty to toll the statute of limitations. Accordingly, we find that the court erred in concluding that the fraudulent concealment doctrine applied to the defendants' actions.

2

We next address the court's conclusion that the continuing course of conduct doctrine applied to the defendants' actions. The defendants argue that "the repeated breach of a contractual obligation to pay money, whether periodically or as royalties are earned, is not subject to the continuing course of conduct doctrine as a matter of law." The plaintiff argues that the doctrine applies because the parties had a special relationship. We agree with the defendants.

"In certain circumstances . . . we have recognized the applicability of the continuing course of conduct doctrine to toll a statute of limitations. Tolling does not enlarge the period in which to sue that is imposed by a statute of limitations, but it operates to suspend or interrupt its running while certain activity takes place. . . . Consistent with that notion, [w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." (Citation omitted; internal quotation marks omitted.) *Flannery* v. *Singer Asset Finance Co.*, *LLC*, supra, 312 Conn. 311. "[I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after the commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where [our Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . Furthermore, [t]he doctrine of continuing course of conduct as used to toll a statute of limitations is better suited to claims where the situation keeps evolving after the act complained of is complete . . . ." (Citations omitted; internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, 94 Conn. App. 593, 608, 894 A.2d 335 (2006), aff'd, 284 Conn. 193, 931 A.2d 916 (2007).

Our Supreme Court has also recently clarified the difference between a continuing course of conduct and a related form of conduct called a "continuing violation." The court described the difference as follows: "Although this court has on occasion used both terms in a manner that would imply that they are interchangeable; see, e.g., *Watts* v. *Chittenden*, [301 Conn. 575,

587, 22 A.3d 1214 (2011)]; the difference between these theories is not simply the circumstances in which they apply, but also the scope of recovery they afford. When there is a continuing violation, each breach gives rise to a new statute of limitations, and the plaintiff is entitled to recover for only those breaches that occurred within the statute of limitations. See *Knight* v. *Columbus*, [19 F.3d 579, 581 (11th Cir.)] ('[w]here a continuing violation is found, the [plaintiff] can recover for any violations for which the statute of limitations has not expired') [cert. denied, 513 U.S. 929, 115 S. Ct. 318, 130 L. Ed. 2d 280 (1994)]; see also *State* v. *Commission on Human Rights & Opportunities*, [211 Conn. 464, 472–73, 559 A.2d 1120 (1989)]. Thus . . . the [plaintiff] would be entitled to [recovery] only for the six year period preceding the filing of [its] claim, as well as prospective relief. Conversely, when there is a continuing course of conduct, the accrual of the cause of action is delayed, and the plaintiff is entitled to recover the full extent of his or her injuries, irrespective of when they commenced. See *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957) ('[w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed') . . . ." (Citations omitted.) *Bouchard* v. *State Employees Retirement Commission*, 328 Conn. 345, 374 n.14, 178 A.3d 1023 (2018).

"The question of whether a party's claim is barred by the statute of limitations is a question of law, which this court reviews de novo. . . . The issue, however, of whether a party engaged in a continuing course of conduct that tolled the running of the statute of limitations is a mixed question of law and fact. . . . We defer to the trial court's findings of fact unless they are clearly erroneous." (Citations omitted.) *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 833, 784 A.2d 905, cert. denied, 258 Conn. 946, 788 A.2d 95 (2001), and cert. denied, 258 Conn. 947, 788 A.2d 96 (2001), and cert. denied sub nom. *Giulietti* v. *Vernon Village, Inc.*, 258 Conn. 947, 788 A.2d 96 (2001), and cert. denied sub nom. *Vernon Village, Inc.* v. *Giulietti*, 258 Conn. 947, 788 A.2d 97 (2001).

In concluding that the continuing course of conduct doctrine applied in this case, the court first characterized the defendants' actions as a series of distinct breaches: "Under the contract, each time the device made money, Aferzon had to notify [the plaintiff] and pay it 50 percent of the total compensation. Aferzon's money depends on ISI's money, which, in turn, depends upon sales of the Alphatec Solus. As the record reflects, those sales vary. They might even cease. But in the meantime, Aferzon signed a contract that calls for him to account for them when and if they come in. Indeed, Aferzon's duty continues into the future, and he would commit no future breach so long as he honestly reports and shares the income. This means that each failure

could easily be seen as its own breach with its own limitation period running from the point at which an installment of money was realized under the license." The court then engaged in a discussion of both continuing violation analysis and the continuing course of conduct doctrine, referring to them interchangeably,[19] citing both *Giulietti* v. *Giulietti*, supra, 65 Conn. App. 813, a case concerning the continuing course of conduct doctrine, and *Bouchard* v. *State Employees Retirement Commission*, supra, 328 Conn. 345, a case predominantly addressing a continuing violation theory and advising that the two theories are not interchangeable. Although the court initially stated that "[a]pplying the continuing violation doctrine to this case is attractive," it ultimately concluded that the continuing course of conduct doctrine applied. The court provided the following reasons for its application of the continuing course of conduct doctrine: (1) the claim concerned "continued and repeated" wrongs, not just a onetime violation; (2) the past wrongs are identical to more recent wrongs, and "[t]reating them as all part of a single continuing wrong is far more efficient than marking each missed payment and starting the clock running anew"; and (3) "allowing the claims to be brought now will likely head off future breaches [because] the violations have not only been continuous, they have been without judicial intervention and are thus likely to continue into the future unless dealt with." Additionally, the court held that Aferzon had a "specific, legally recognized duty in contract that was continuing . . . ." It likened this relationship to a "special relationship" of the sort that can establish a continuing duty to a party. See *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 835, 95 A.3d 1063 (2014).

The court's conclusion is legally erroneous because the nature of the defendants' breaches is incompatible with the continuing course of conduct doctrine. We look first to the definition of a continuing course of conduct. "[I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the *breach of a duty* that remained in existence after commission of the *original wrong* related thereto." (Emphasis added; internal quotation marks omitted.) *Flannery* v. *Singer Asset Finance Co., LLC*, supra, 128 Conn. App. 513–14. Courts have found that such a duty continues to exist after the original wrong where there is "some later wrongful conduct of a defendant related to the prior act." (Internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 94 Conn. App. 608. Put another way, "a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an *initial wrong* upon the plaintiff. . . . A second requirement for the operation of [this doctrine] is that there must be evidence of the *breach of a duty* that remained in existence after commission of

the original wrong related thereto." (Emphasis added; internal quotation marks omitted.) *Watts* v. *Chittenden*, supra, 301 Conn. 585.

This language suggests that a continuing course of conduct requires both an initial wrong and a subsequent continuing duty that are distinct from one another. In the present case, the breach of the duty to disclose *is* the initial wrong. After receiving compensation and failing to notify the plaintiff, the duty to disclose that compensation may continue into the future, but the breach of that duty is the initial wrong complained of. For example, in *Sanborn* v. *Greenwald*, 39 Conn. App. 289, 664 A.2d 803, cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995), this court summarized several cases in which our Supreme Court upheld application of the doctrine, identifying a distinct initial action and breach of a subsequent duty for each: "In *Blanchette* v. *Barrett*, [229 Conn. 256, 640 A.2d 74 (1994)], the statute of limitations was tolled because of evidence that the defendant physician had failed to satisfy his duty of monitoring the plaintiff's questionable breast condition. The court considered this to be later wrongful conduct that related to the defendant's [initial] diagnosis of the plaintiff. Id., 275. In *Cross* v. *Huttenlocher*, 185 Conn. 390, 440 A.2d 952 (1981), the statute of limitations was tolled because of the negligent failure of a physician to warn a patient of the harmful side effects of a drug that the physician had prescribed and that the patient had continued to ingest over a period of time. In *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 429 A.2d 486 (1980), the statute of limitations was tolled because the installer of a pilot light gave repeated instructions as to its use in response to multiple complaints by the plaintiff. In *Handler* v. *Remington Arms Co.*, supra, 144 Conn. 316, the statute of limitations was tolled by the defendant manufacturer's continuing failure to warn of the potential danger associated with an inherently dangerous cartridge of ammunition. In each of these cases, the plaintiff's injury was perpetuated, enhanced and even caused by the breach of a duty on the part of the defendant." *Sanborn* v. *Greenwald*, supra, 296. We also note that this court has expressed skepticism as to whether the doctrine should ever be applied to breach of contract claims: "[T]he continuing course of conduct doctrine is one classically applicable to causes of action in tort, rather than in contract. The doctrine concerns itself with 'wrongs,' the nomenclature of tort, not with 'breach,' the language of contract." *Fradianni* v. *Protective Life Ins. Co.*, 145 Conn. App. 90, 100 n.9, 73 A.3d 896, cert. denied, 310 Conn. 934, 79 A.3d 888 (2013).

These cases demonstrate that repeated and distinct violations of a duty to disclose are not what is contemplated by the definition of a continuing course of conduct. "[T]he continuing course of conduct doctrine recognizes that the act or omission that commences the limitation period may not be discrete and attributable

to a fixed point in time. [T]he doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury . . . ." (Internal quotation marks omitted.) *Essex Ins. Co.* v. *William Kramer & Associates, LLC*, 331 Conn. 493, 503, 205 A.3d 534 (2019). Here, the defendants repeatedly breached the agreement, and every breach is readily identifiable. The plaintiff entered exhibits clearly delineating the date and amount of each distinct royalty payment which the defendants received from Alphatec without notifying the plaintiff. "[T]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." (Internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 837–38.

On the other hand, with respect to what constitutes a continuing violation, our Supreme Court cited with approval the following explanation: "In between the case in which a single event gives rise to continuing injuries and the case in which a continuous series of events gives rise to a cumulative injury is the case in which repeated events give rise to discrete injuries, as in suits for lost wages. If our plaintiff were seeking [back pay] for repeated acts of wage discrimination (suppose that every [payday] for five years he had received $100 less than he was entitled to), he would not be permitted to reach back to the first by suing within the [limitation] period for the last. . . . [In such a case] the damages from each discrete act . . . would be readily calculable without waiting for the entire series of acts to end. There would be no excuse for the delay." (Citations omitted; internal quotation marks omitted.) *Watts* v. *Chittenden*, supra, 301 Conn. 588–89. The case at hand is akin to the latter scenario.[20]

In *Fradianni* v. *Protective Life Ins. Co.*, supra, 145 Conn. App. 90, this court reviewed whether the continuing course of conduct doctrine applied to a life insurance company's conduct in annually overcharging the plaintiff. Citing the previously quoted passage from *Watts*, this court concluded that the defendant's actions were more accurately characterized as a series of distinct breaches, and thus held as follows that the continuing course of conduct doctrine did not apply to the plaintiff's claim: "The case now before us, where the plaintiff alleges that the defendant breached the insurance contract annually, at precisely identifiable moments when it allegedly overcharged the plaintiff, is analogous to the suit for lost wages as described [in *Watts* v. *Chittenden*, supra, 301 Conn. 588–89]. The plaintiff's damages arising from the defendant's alleged breaches were readily calculable and actionable at the time of breach, unlike those cases where it is the cumulative effect of the defendant's behavior that gives rise

to the injury. Simply put, the plaintiff's allegations do not constitute a 'course of conduct' by the defendant; but instead allege a series of repeated breaches over a period of years. Accordingly, the continuing course of conduct doctrine is inapplicable to the present case. We, therefore, conclude that the court properly found that the doctrine did not serve to toll the [statute of limitations]." (Footnote omitted.) *Fradianni* v. *Protective Life Ins. Co.*, supra, 100. The present case, like *Fradianni*, involves a series of separate breaches to which the continuing course of conduct doctrine does not apply because each such breach caused separate damages that were readily calculable at the time of breach.

Lastly, we address the court's conclusion that the parties had a special relationship. The existence of a special relationship between the parties is another basis for establishing the continuation of a duty between them after an initial wrong has been committed. See *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 94 Conn. App. 608. The court concluded that the parties had a special relationship because Aferzon "[had] a specific, legally recognized duty in contract that was continuing and required [him] to report his gains from the device idea to [the plaintiff]."

"Our appellate courts have not defined precisely what constitutes a special relationship for purposes of tolling because the existence of such a relationship will depend on the circumstances that exist between the parties and the nature of the claim at issue. Usually, such a special relationship is one that is built upon a fiduciary or otherwise confidential foundation. A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him. . . . Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians. . . . The fact that one [businessperson] trusts another and relies on [that person] to perform [his obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty. . . . [N]ot all business relationships implicate the duty of a fiduciary. . . . In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence. . . . Accordingly, a mere contractual relationship does not create a fiduciary or confidential relationship." (Citations omitted; internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America,*

supra, 312 Conn. 835–36.

The plaintiff and Aferzon clearly were dealing with each other at arm's length in the course of an ordinary contractual relationship. The court made no factual findings indicating that the parties had a confidential relationship or that there was a unique degree of trust and confidence between them. The court did make findings as to Aferzon's medical background and lengthy surgical experience, but it did not make any finding that Aferzon had any "superior knowledge, skill or expertise" as to the development of medical devices, which is the subject of this agreement. The only justification that the court provided for this finding was that Aferzon had a specific and continuing duty to report any compensation to the plaintiff, but this is merely the contractual obligation imposed on him by the agreement. Such a duty alone is insufficient to establish a special relationship.

Because there was no evidence before the court that would have supported a finding that a special relationship existed between the parties, and Aferzon's breaches more accurately are characterized as a series of distinct, readily calculable breaches of the parties' agreement, the trial court erred in concluding that the continuing course of conduct doctrine tolled the running of the statute of limitations.

3

Our conclusion that the trial court improperly concluded that the running of the statute of limitations had been tolled as to the plaintiff's breach of contract claim now raises the necessary questions of what statute of limitations applies to that claim and to what extent can the plaintiff recover expectation damages for the defendants' proven breaches of the parties' contract. Rather than remand these issues to the trial court for consideration in the first instance, we review them now on the basis of the trial court's unchallenged factual findings.[21] We note that the record is adequate for review of these issues, and neither determination requires further factual development. We rely on the court's express factual findings, which were based on unchallenged facts and exhibits. We address each issue in turn.

a

We first address which statute of limitations applies to the plaintiff's claims. The determination of which statute of limitations applies to an action is a question of law over which our review is plenary. See, e.g., *Pasco Common Condominium Assn., Inc.* v. *Benson*, 192 Conn. App. 479, 501, 218 A.3d 83 (2019).

The court stated that, "[f]or written contracts, the limitation period is established as a six year period . . . . For oral contracts the limitation period is established as a three year period . . . ." The distinction,

however, is not that simple. All contracts have a six year statute of limitations except for those that are *both* oral and executory. "General Statutes § 52-581 provides a three year statute of limitations for executory oral contracts. . . . All other contracts are governed by a six year statute of limitations pursuant to General Statutes § 52-576." (Citation omitted.) *Mitchell* v. *Guardian Systems, Inc.*, 72 Conn. App. 158, 161 n.3, 804 A.2d 1004, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002). "This court has addressed the distinction between §§ 52-581 and 52-576. These two statutes, each establishing a different period of limitation, can both be interpreted to apply to actions on oral contracts. Our Supreme Court has distinguished the statutes, however, by construing § 52-581, the three year statute of limitations, as applying only to *executory* contracts. . . . A contract is *executory* when neither party has fully performed its contractual obligations and is *executed* when one party has fully performed its contractual obligations. . . . It is well established, therefore, that the issue of whether a contract is oral is not dispositive of which statute applies. Thus, the . . . argument that § 52-581 automatically applies to [an] oral contract between . . . parties is incorrect. The determinative question is whether the contract was executed."(Emphasis in original; internal quotation marks omitted.) *Bagoly* v. *Riccio*, 102 Conn. App. 792, 799, 927 A.2d 950, cert. denied, 284 Conn. 931, 934 A.2d 245, and cert. denied, 284 Conn. 931, 934 A.2d 246 (2007).

The contract between the parties in the present case is not executory, as it cannot be said that neither party has fully performed its contractual obligations thereunder. There may have been some dispute as to the extent of the plaintiff's obligations before the trial court, but neither party has challenged the court's factual finding that the plaintiff fully performed its contractual obligations thereunder. Accordingly, the six year statute of limitations set forth in § 52-576 applies to the plaintiff's breach of contract claim.

b

We next address the extent of the plaintiff's recovery for breaches of contract occurring within the applicable six year period of limitation.

The court characterized the defendants' breaches as distinct and readily calculable: "[T]his case involves a series of breaches, not just one. . . . [E]ach failure could easily be seen as its own breach with its own limitation period running from the point at which an installment of money was realized under the license." As we have previously explained, such conduct constitutes what our Supreme Court in *Bouchard* has called a continuing violation rather than a continuing course of conduct: "When there is a continuing violation, each breach gives rise to a new statute of limitations, and the plaintiff is entitled to recover for only those

breaches that occurred within the statute of limitations." *Bouchard* v. *State Employees Retirement Commission*, supra, 328 Conn. 374 n.14. Accordingly, determining what portion of the plaintiff's expectation damages, as awarded by the court, were properly awarded to it for breaches that occurred within the six year limitation period is a simple matter of drawing a line six years back from the date the plaintiff commenced this action, adding together all payments received by the defendants since that date from the sale and/or licensing of the patented device, and dividing that sum in half to calculate the plaintiff's 50 percent share of such payments. The resulting total of such properly awarded expectation damages for breach of contract is $996,039.97.

Service was effectuated on July 16, 2018. See *Doe* v. *West Hartford*, 328 Conn. 172, 177 n.4, 177 A.3d 1128 (2018) ("[t]ypically, an action is 'commenced,' for purposes of determining compliance with a statute of limitations, when the defendant is served with a summons and complaint"). Thus, the plaintiff was properly awarded its 50 percent share of all royalty payments received by the defendants for sale and/or licensing of the Solus as far back as July 16, 2012. The plaintiff submitted, and the court credited the facts presented in, plaintiff's exhibit 16, which lists every payment ISI received from Alphatec, after they entered into their cross license agreement, from 2010 to 2019. For each such payment, exhibit 16 sets forth the amount of the payment, the date on which it was received by ISI, a calculation of 50 percent of its total value representing the plaintiff's share of the payment under the parties' agreement, and the plaintiff's proposal for an award of prejudgment interest under § 37-3a based on the defendants' wrongful detention of the plaintiff's share of that payment from the date of its receipt until May 4, 2020, calculated at the maximum statutory rate of 10 percent per year. These facts and figures are not in dispute. The parties had the opportunity to challenge the court's adoption of the facts set forth in exhibit 16 as its basis for awarding the plaintiff expectation damages and prejudgment interest at the lesser rate of 4.5 percent per year, but neither party did so.

Starting in July, 2012, the first payment made by Alphatec to the defendants as compensation for the sale and/or licensing of the patented device within the six year limitation period, was received by ISI on July 26, 2012. The plaintiff was properly awarded expectation damages totaling 50 percent of the sum of that first payment and of all subsequent payments of royalties for the sale and/or licensing of the patented device that the defendants received within the six year limitation period. The total of all expectation damages awarded by the court on the basis of the defendants' failure to pay the plaintiff its 50 percent share of all compensation that they had received for the sale and/or licensing of

the patented device within the six year limitation period was $996,039.97. Accordingly, the court's judgment for the plaintiff on its claim of breach of contract must be adjusted downward to that amount.

This also raises the issue of whether the court appropriately subtracted $50,000 for development expenses from the plaintiff's recovery. On October 1, 2009, ISI received a $50,000 payment from Alphatec that the defendants claimed was reimbursement for expenses related to acquiring the patent for the device. The court credited the defendants' characterization of this payment and did not allow the plaintiff to recover on it, explaining that the contract did not contemplate recovery by the plaintiff based on any payment that was not actually a royalty payment: "[T]he evidence does show that Alphatec denominated $50,000 of the money it paid as an expense reimbursement. The evidence also shows expenses that amount to nearly $50,000 for patent related expenses incurred at a time when they were most likely legitimate expenses associated with acquiring the anterior patent. Knowing that the agreement called for future agreement about 'financial commitments,' the court concludes that this is a reasonable sum for expenses under the [plaintiff's] contract terms and would have been part of the bargain had it been carried out. . . . On the breach of contract claim, [the plaintiff] is due only what it could reasonably expect to have received under the contract. If the court were to punish Aferzon rather than hold him as best we can to his bargain, it would have to apply a different standard, not ordinary damages analysis. In the meantime, despite problems posed by Aferzon himself, the court's job is to give [the plaintiff] the benefit of its bargain. That benefit was expected to exclude required financial commitments, and the court is convinced that, unlike the other sums claimed, this $50,000 sum is more likely than not a genuine expense reimbursement associated with the anterior patent. This means [the plaintiff's] expectation damages are $1,637,389 minus $50,000 or $1,587,289."

The court's foregoing explanation makes it clear that the plaintiff requested total expectation damages of $1,637,289 for breach of contract on the basis of the defendants' failure to pay it all sums listed in exhibit 16, each of which it claimed to have been its 50 percent share of a payment received by the defendants from Alphatec in the course of their cross license agreement. Although the court recognized that one such listed sum, in the amount of $25,000, was not recoverable for breach of contract because it constituted 50 percent of the initial $50,000 reimbursement payment, it unaccountably included that sum in its calculation of the plaintiff's total expectation damages award, then subtracted twice that amount—the full $50,000 reimbursement payment on which it was based—from the plaintiff's total award.

Whether the court erred in including the $25,000 improperly claimed by the plaintiff as unshared compensation resulting from the sale and/or licensing of the patented device or in subtracting from that award the entire $50,000 reimbursement payment from which that $25,000 sum was calculated, we need not make similar modifications of the plaintiff's adjusted award of expectation damages to reflect what the defendants failed to pay it under the November 4, 2004 agreement from compensation it received within the six year limitation period. The reason for this conclusion is simply that the $50,000 reimbursement payment was received by the defendant before that six year limitation period began. Accordingly, there is no reason to subtract any amount from the plaintiff's expectation damages to account for that payment because it is not included in the new total to begin with. The plaintiff's recoverable expectation damages for breach of contract must therefore be reduced to $996,039.97, as previously noted, in light of our conclusion as to the viability of the defendants' special defense under the statute of limitations.

Lastly, we must determine what portion of the prejudgment interest awarded to the plaintiff under § 37-3a for the defendants' allegedly wrongful detention of money due and owing to the plaintiff prior to judgment was properly based on the defendants' actionable failure to pay the plaintiff its 50 percent share of all compensation received by the defendants for the sale and/or licensing of the patented device within the six year limitation period. When the court made its initial award of prejudgment interest in its memorandum of decision of April 22, 2020, it improperly awarded interest on all sums claimed by the plaintiff as expectation damages for breach of contract in exhibit 16, including several sums claimed on the basis of payments received by the defendants outside of the six year limitation period. The total interest so awarded must also be adjusted downward to exclude all sums improperly awarded to the plaintiff for the detention of moneys to which the plaintiff did not become entitled within the six year limitation period. The court later compounded this error by awarding the plaintiff an additional sum of prejudgment interest on the basis of the defendants' further alleged detention of those same sums for an additional 140 days beyond May 4, 2020, until final judgment was rendered on September 21, 2020. That additional award of prejudgment interest must also be reduced to exclude from it all interest improperly awarded on the basis of the alleged detention of sums which the plaintiff was barred from recovering by the statute of limitations.

The total prejudgment interest properly awarded by the court on the basis of the defendants' wrongful detention of the plaintiff's 50 percent shares of compensation received for the sale and/or licensing of the patented

device within the six year limitation period must be determined in two steps. First, as to sums properly awarded to the plaintiff in the court's memorandum of decision through May 4, 2020, we need only add together all awards of prejudgment interest on those sums, as proposed by the plaintiff on exhibit 16 at the rate of 10 percent per year, and multiply that total by 0.45 to refigure such interest, as the court did, at the lower rate of 4.5 percent per year. The total of such properly awarded interest through May 4, 2020, as included in the larger award of interest ordered by the court in its memorandum of decision, is $191,748.60.

Finally, we must adjust the end date for the calculation of prejudgment interest from May 4, 2020, to September 21, 2020, which the court did when it rendered final judgment for the plaintiff. The court, however, did not calculate separate awards of additional prejudgment interest for each payment to which it found that the plaintiff was entitled on the basis of the defendants' further detention of the plaintiff's recoverable damages until September 21, 2020. Instead, it ordered an increase in the total award of prejudgment interest it had previously ordered in its memorandum of decision on the basis of the further detention of all sums requested by the plaintiff as expectation damages, as listed in exhibit 16. To calculate what portion of that additional prejudgment interest award was ordered appropriately on the basis of the further wrongful detention of moneys to which the plaintiff became entitled during the six year limitation period, we must first determine what percentage of all expectation damages requested by the plaintiff in exhibit 16 the plaintiff's wrongfully withheld damages represented. Then, we must multiply the court's total additional prejudgment interest award by the decimal equivalent of that percentage to determine how much of such additional interest was properly awarded. Here, where the total expectation damages requested by the plaintiff in exhibit 16 was $1,637,289.04 and the total expectation damages lawfully claimed by the plaintiff for the defendants' breaches of contract within the limitation period was $996,039.97, the percentage of all requested damages which the plaintiff's recoverable damages represented was 60.8347 percent. By multiplying the court's total award of additional prejudgment interest, $28,240.20, by the decimal equivalent of that percentage, 0.608347, we calculate that the additional prejudgment interest that the court properly awarded to the plaintiff based on the defendants' continuing wrongful detention of moneys recoverable by it from May 4, 2020, to September 21, 2020, was $17,179.84. By adding that sum to the $191,748.60 in prejudgment interest that the court properly awarded to the plaintiff in its memorandum of decision on the basis of the defendants' previous wrongful detention of those same recoverable expectation damages until May 4, 2020, we have determined that the court properly awarded the

plaintiff a total of $208,928.44 in prejudgment interest. By adding that adjusted, $208,928.44 award of prejudgment interest to the plaintiff's adjusted, $996,039.97 award of expectation damages for breaches of contract occurring within the six year limitation period for breach of contract claims, we calculate the plaintiff's proper adjusted total award for breaches of contract occurring within that limitation period as $1,204,968.41.

D

We next address whether the court appropriately awarded the plaintiff attorney's fees and costs under CUTPA. The defendants argue that, because the two tolling doctrines that the court improperly applied in rejecting their statute of limitations defense to the plaintiff's breach of contract claim are inapplicable to claims under CUTPA, the court improperly considered evidence of conduct occurring outside of the three year statute of limitations for CUTPA claims set forth in § 42-110g as a basis for concluding that they had violated CUTPA. The plaintiff responds that, even if the running of the CUTPA statute of limitations was not tolled by the fraudulent concealment doctrine and/or the continuing course of conduct doctrine, a substantial number of the defendants' bad faith breaches of contract on which the court based its finding of a CUTPA violation occurred within the three year CUTPA statute of limitations. Although we have already found that there is insufficient evidence to support the plaintiff's claims of tolling under either the fraudulent concealment doctrine or the continuing course of conduct doctrine, and thus agree with the defendants that its conduct outside of the three year limitation period cannot be found to have constituted an actionable CUTPA violation in this case, we agree with the plaintiff that the court's finding of a CUTPA violation must still be upheld on the basis of the defendants' proven bad faith breaches of contract that occurred within the statute of limitations, and thus that attorney's fees were properly awarded to it for the prosecution of that claim. Even so, because the court awarded attorney's fees for prosecution of both the timely and the untimely portions of the plaintiff's CUTPA claim, we conclude that the case must be remanded to the trial court for a determination, if possible, of what portion of such attorney's fees were reasonably incurred to prosecute the timely portion of the plaintiff's claim.

The following additional facts and procedural history are relevant to this claim. In reviewing the plaintiff's CUTPA claim, the court first concluded that the parties' transactions were subject to CUTPA: "There can't be any doubt that this was a business transaction between the parties and that [the plaintiff] came out the financial loser. So, the real focus of inquiry here should be whether what Aferzon did and made ISI do was culpable enough to label an unfair trade practice." The court

then concluded that Aferzon had violated CUTPA by breaching the agreement in bad faith, and listed several actions by him that supported its conclusion that he had so acted: "The court believes the evidence is clear and convincing that Aferzon breached his agreement not prompted by an honest mistake as to his rights or duties, but by an interested or sinister motive. Specifically, the court concludes that Aferzon knew he had an obligation to [the plaintiff] but contrived a variety of unscrupulous means to deprive [the plaintiff] of what it was due. He lied to [the plaintiff] about the status of the project. He ignored [its] requests for information. He disregarded two demands from lawyers. He contrived [a limited liability company] at least in part as a way to frustrate his agreement. He fabricated expenses to cause it to appear that the idea at issue wasn't profitable. He concealed his activities until the normal statute of limitations period expired and then invoked it in his defense." The court declined to award punitive damages or further compensatory damages for the violation but awarded attorney's fees under CUTPA. On September 15, 2020, the court awarded the plaintiff $756,000 in attorney's fees and expenses. The defendants do not challenge the amount of the award but argue that the award of attorney's fees was legally erroneous.

We first set forth our standard of review. Section 42-110g (d) provides in relevant part: "In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. . . ." "Awarding . . . attorney's fees under CUTPA is discretionary [pursuant to] § 42-110g (a) and (d) . . . and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done. . . . The salient inquiry is whether the court could have reasonably concluded as it did. . . . [T]he term abuse of discretion does not imply a bad motive or wrong purpose but merely means that the ruling appears to have been made on untenable grounds." (Internal quotation marks omitted.) *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, 109 Conn. App. 308, 315, 951 A.2d 26 (2008).

Because a finding of liability under CUTPA is a necessary prerequisite to an award of attorney's fees under CUTPA, we also set forth the applicable standard of review for a finding that a defendant violated CUTPA. See *Winakor* v. *Savalle*, 198 Conn. App. 792, 811, 234 A.3d 1122 ("[g]iven our conclusion that the defendant did not violate CUTPA, there is no basis for the plaintiff's recovery of any attorney's fees in the present case"), cert. granted, 335 Conn. 958, 239 A.3d 319 (2020). Section 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or

employment of a method, act or practice prohibited by [§] 42-110b, may bring an action . . . to recover actual damages. . . ." In other words, "CUTPA provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 699, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011).

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . To the extent that [an appellant] is challenging the trial court's interpretation of CUTPA, our review is plenary. . . . [W]e review the trial court's factual findings under a clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *National Waste Associates, LLC* v. *Scharf*, 183 Conn. App. 734, 751, 194 A.3d 1 (2018). "[W]hether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 699.

The defendants are correct that the court engaged in no discussion of whether a statute of limitations applied to the plaintiff's CUTPA claim. Rather, when it discussed fraudulent concealment and continuing course of conduct, the court generally concluded, without narrowing its focus to particular claims, that "[t]*his lawsuit* is not barred by the statute of limitations." (Emphasis added.) Section 42-110g (f) provides that "[a]n action under this section may not be brought more than three years after the occurrence of a violation of this chapter." The court did not discuss the applicable statute of limitations or whether fraudulent concealment or a continuing course of conduct by the defendants could toll the running of that statute of limitations.[22] The defendants argue that neither fraudulent concealment nor a continuing course of conduct can

toll the statute of limitations for a claim under CUTPA. See *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 216, 541 A.2d 472 (1988). Although it does not appear that our courts have squarely addressed this issue, we need not reach the issue here because we have concluded that neither doctrine applies to the defendants' conduct in this case, nor, by extension, to their special defenses under any pleaded statute of limitations. See part I C of this opinion.

Accordingly, the defendants argue that, of the conduct described by the court in its discussion of CUTPA, "[t]he only activities occurring within the three years prior to [the plaintiff's] suit are Aferzon's disregarding of [the plaintiff's] lawyers' letters and his alleged litigation conduct," which actions assertedly cannot constitute CUTPA violations. It is clear from the court's memorandum of decision, however, that not all of the defendants' actions, as described by the court, were claimed to constitute unfair trade practices in violation of CUTPA but instead were described as evidence supporting the court's conclusion that Aferzon's breaches of the parties' agreement were made in bad faith, and that such bad faith breaches of contract are what constituted the alleged CUTPA violations. The court explained that "[o]rdinary contract breaches are not unfair trade practices. Breaches made in bad faith can be unfair trade practices. . . . This court believes the evidence is clear and convincing that Aferzon breached his agreement not prompted by an honest mistake as to his rights or duties, but by an interested or sinister motive." As the court explained, the defendants breached the agreement every time ISI received a payment from Alphatec and failed to notify or compensate the plaintiff per the agreement. ISI received thirty-four royalty payments for the sale and/or licensing of the patented device between 2010 and 2019, which it failed to share with the plaintiff in breach of the parties' agreement. Thirteen of those breaches occurred within the three year limitation period preceding the date of commencement of this action on July 16, 2018. Therefore, we review the court's decision awarding attorney's fees for the prosecution of the plaintiff's claim by addressing whether those thirteen breaches of contract are sufficient to establish a CUTPA violation.

First, we note that the court is correct that bad faith breaches of contract, but not ordinary breaches, can be found to constitute unfair trade practices under CUTPA. "[T]he same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation"; *Lester* v. *Resort Camplands International, Inc.*, 27 Conn. App. 59, 71, 605 A.2d 550 (1992); but not every contractual breach will rise to the level of a CUTPA violation. *Hudson United Bank* v. *Cinnamon Ridge Corp.*, 81 Conn. App. 557, 571, 845 A.2d 417 (2004). "[W]e never have suggested that . . . CUTPA claims are barred if the plaintiff suffered only an economic

loss and the loss arose solely from the breach of the contract. Rather, our focus in such cases has been on whether the defendant's breach of contract was merely negligent or incompetent, in which case the CUTPA claim was barred, or whether the defendant's actions would support a finding of intentional, reckless, unethical or unscrupulous conduct, in which case the contractual breach will support a CUTPA claim under the second prong of the cigarette rule." (Emphasis omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 410, 78 A.3d 76 (2013).

Our Supreme Court has cited with approval language employed by federal courts indicating that "absent substantial aggravating circumstances, [a] simple breach of contract is insufficient to establish [a] claim under CUTPA . . . ." *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 248, 919 A.2d 421 (2007); id., 247 (defendant employee's breach of employment agreement and attempted takeover of plaintiff publicly traded corporation was insufficient to establish CUTPA violation in absence of showing that employee's attempted takeover was "in and of itself" unlawful). "In the absence of aggravating unscrupulous conduct, mere incompetence does not by itself mandate a trial court to find a CUTPA violation." *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 229, 990 A.2d 326 (2010); id., 230–31 (trial court's finding of no CUTPA violation was not clearly erroneous where defendant's breaches of contract "constituted nothing other than mere incompetence"); see also *IN Energy Solutions, Inc.* v. *Realgy, LLC*, 114 Conn. App. 262, 274–75, 969 A.2d 807 (2009) (breach of sales contract did not constitute CUTPA violation when trial court specifically found that plaintiff failed to prove that defendant's breach was unethical, unscrupulous, wilful or reckless); *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 279–80, 89 A.3d 373 (2014) (reversing trial court's award of CUTPA attorney's fees where evidence failed to support claim beyond mere breach of contract).

In *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 678, this court upheld a finding that the defendant had violated CUTPA by terminating an agreement in bad faith. The trial court listed nine factual findings in support of this conclusion. Id., 705–706. This court ruled that none of those findings was clearly erroneous, and affirmed the finding of bad faith. Id., 708. The court's ultimate conclusion was as follows: "The [trial] court's findings reveal that the defendant engaged in a pattern of bad faith conduct, seeking to escape its contractual obligations unfairly while negotiating a more favorable offer with . . . a third party. Given the wrongful termination and the aggravating circumstances, there is ample support for the trial court's conclusion that the defendant's actions violated CUTPA. Therefore, the court's finding of a CUTPA violation was not clearly erroneous." Id.

We begin with the court's finding that the defendants breached the contract in bad faith. "[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007).

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." (Internal quotation marks omitted.) *Keller* v. *Beckenstein*, 117 Conn. App. 550, 563–64, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009). "Whether a party has acted in bad faith is a question of fact, subject to the clearly erroneous standard of review." *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 837, 3 A.3d 992 (2010).

First, we note that the facts supporting the court's conclusion that Aferzon acted in bad faith in breaching the agreement are not subject to the three year statute of limitations for CUTPA claims. The three year statute of limitations applies to the particular conduct that the court found to constitute unfair trade practices in violation of CUTPA, not to the subordinate factual findings supporting its conclusion that when Aferzon engaged in such conduct he was acting in bad faith. They are separate determinations. As we have explained, a number of the defendants' bad faith breaches of contract occurred within the three year limitation period, and each successive breach occurred in the course of and in furtherance of the same bad faith scheme.

On the basis of our review of the record, we conclude that the court's finding that Aferzon breached the agreement in bad faith is supported by the evidence. The court explained that Aferzon lied about the status of the project, ignored the plaintiff's requests for information, disregarded letters from the plaintiff's counsel, created ISI as a way to get around the agreement, and attempted to fabricate expenses during litigation. There is support

for each of these findings in the record. Therefore, it was not clearly erroneous for the court to conclude that Aferzon's repeated breaches of the agreement after engaging in such conduct were made in bad faith.

We next consider the court's subsequent conclusion that the defendants' bad faith breaches of the agreement constituted CUTPA violations. We iterate that a trial court's decision as to whether a defendant's acts constitute deceptive or unfair trade practices in violation of CUTPA is a question of fact that we review for clear error. *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 699–708.

The court's conclusion that the defendants committed unfair trade practices was not clearly erroneous. Breaches of contract can constitute CUTPA violations when found to have been committed in aggravating circumstances, with unscrupulous conduct, or in bad faith. See *Ulbrich* v. *Groth*, supra, 310 Conn. 410; *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 708. The defendants breached the agreement thirteen times within the applicable limitation period, and the court listed several aggravating circumstances, for which we have found support in the record, supporting its conclusion that these breaches were made in bad faith. In *Landmark Investment Group, LLC*, this court explained that even a single act of misconduct can constitute a CUTPA violation. See *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 708.

Therefore, we affirm the court's finding of a CUTPA violation and its decision to award the plaintiff its attorney's fees. Because, however, the court engaged in no discussion of the applicable statute of limitations, and several breaches on which it did rely in finding such a violation occurred outside of the three year limitation period, we must remand the case to the court with instructions to determine, if possible, what portion of the fees and costs it awarded under CUTPA were reasonably incurred to litigate that portion of the CUTPA claim that was not barred by the statute of limitations. The court should consider only the time spent litigating and establishing the breaches for which a recovery is permissible under CUTPA and the time spent establishing the factual basis for its finding that such actionable breaches were committed in bad faith. We recognize that it may be impracticable for the court to apportion the fees in this fashion; see *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 333, 63 A.3d 896 (2013) ("when certain claims provide for a party's recovery of contractual attorney's fees but others do not, a party is nevertheless entitled to a full recovery of reasonable attorney's fees if an apportionment is impracticable

because the claims arise from a common factual nucleus and are intertwined"); see also *Heller* v. *D. W. Fish Realty Co.*, 93 Conn. App. 727, 734–36, 890 A.2d 113 (2006); but, this is not something that we can determine in the first instance on appeal. There may be some portion of the attorney's time that was definitively spent on violations occurring outside of the limitation period, for example, any time spent determining or litigating the cash value of the Alphatec stock transfer, which occurred in 2010, outside of the limitation period for CUTPA claims. Accordingly, we remand this case to the trial court with instructions to determine the amount of attorney's fees and costs that the plaintiff is entitled to recover, limited to those fees and costs reasonably incurred to prosecute the portion of its claim under CUTPA that was based on the defendants' bad faith breaches of the parties' contract within the three year limitation period applicable to such claims under § 42-110g (f).

## II

### THE PLAINTIFF'S CROSS APPEAL

The plaintiff cross appeals from the court's award of offer of compromise interest. The plaintiff argues that the court committed multiple errors in its calculation of the amount of interest to which it is entitled based on the defendants' failure to accept its offer of compromise. The defendants have not filed an answering brief on the plaintiff's cross appeal. We agree with the plaintiff that the court erred in determining the amount of offer of compromise interest to which it was entitled in this case, and thus reverse the court's judgment with respect to that issue and remand this case with instructions to recalculate its award of offer of compromise in a manner consistent with this opinion.

The following additional facts and procedural history are relevant to this issue. On October 10, 2019, the plaintiff filed a unified offer of compromise pursuant to § 52-192a, offering to settle its claims against the defendants for $1,150,000.[23] The parties do not dispute that the offer was appropriately made more than 180 days after the defendants were served with legal process in this action, more than 30 days prior to the first day of trial and within 18 months of the filing of the complaint. The defendants did not accept the offer. On April 22, 2020, the court rendered judgment for the plaintiff, ultimately awarding it $1,587,289 in expectation damages on its breach of contract claim, prejudgment interest in the amount of $504,054 under § 37-3a, and $756,000 in expenses and attorney's fees under CUTPA. On May 21, 2020, the plaintiff moved for the court to award offer of compromise interest, claiming "[the plaintiff] is entitled to mandatory offer of compromise interest at the rate of 8 percent per year on the total of (1) [the plaintiff's] expectation damages, (2) prejudgment interest and (3) attorney's fees and

expenses awarded, calculated from July 19, 2018[24] (the date [the plaintiff] filed its complaint) through the date this court enters final judgment." (Footnote added.)

The court rendered final judgment for the plaintiff on September 21, 2020, awarding it $90,968.00 in offer of compromise interest. Before explaining its calculations, the court expressed its concern that the offer of compromise interest it awarded would be too severe: "The court is concerned that the 8 percent interest rate dictated by the offer of compromise statute is today extraordinary. It is a penalty whose severity has markedly increased. . . . The idea is to provide compensation for the wrongful detention of the money and a significant but not draconian consequence for failing to accept the offer of compromise." To address these concerns, the court deviated from the statutory language of § 52-192a in three ways. First, it awarded the plaintiff interest on the difference between the amount it recovered in the action and the amount of the settlement proposed in the offer of compromise, rather than on the total amount of the plaintiff's recovery. Second, the court did not include its award of prejudgment interest to the plaintiff under § 37-3a in the total amount of the court's award of money damages for the purpose of calculating the amount of offer of compromise interest it should award.[25] Third, not wanting to award "interest on the interest," the court subtracted 4.5 percent, representing the interest it had already awarded to the plaintiff under § 37-3a, from the 8 percent interest rate established by statute for the calculation of offer of compromise interest in § 52-192a, and thus applied an interest rate of 3.5 percent when calculating the amount of the plaintiff's offer of compromise award. Ultimately, applying a 3.5 percent annual interest rate to the reduced sum of $1,193,289, which did not include the prejudgment interest it had awarded to the plaintiff, the court awarded the plaintiff a total of $90,968 in offer of compromise interest.

Each of the three adjustments detailed previously was improper. We address each in turn, but first set forth our standard of review. "[The purpose of § 52-192a] is to encourage pretrial settlements and, consequently, to conserve judicial resources. . . . [T]he strong public policy favoring the pretrial resolution of disputes . . . is substantially furthered by encouraging defendants to accept reasonable offers of judgment.[26] . . . Section 52-192a encourages fair and reasonable compromise between litigants by penalizing a party that fails to accept a reasonable offer of settlement. . . . In other words, interest awarded under § 52-192a is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources." (Citations omitted; footnote added; internal quotation marks omitted.) *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 742, 687 A.2d 506 (1997). "The

question of whether the trial court properly awarded interest pursuant to § 52-192a is one of law subject to de novo review. . . . It is well established that [§] 52-192a provides for interest until the date of judgment. . . . Section 52-192a (b) requires a trial court to award interest to the prevailing plaintiff from the date of the filing of a complaint to the date of judgment whenever: (1) a plaintiff files a valid offer of judgment within eighteen months of the filing of the complaint in a civil complaint for money damages; (2) the defendant rejects the offer of judgment; and (3) the plaintiff ultimately recovers an amount greater than or equal to the offer of judgment." (Citations omitted; internal quotation marks omitted.) *Aubin* v. *Miller*, 64 Conn. App. 781, 800, 781 A.2d 396 (2001). "The interest awarded is in no way discretionary." *Paine Webber Jackson & Curtis, Inc.* v. *Winters*, 22 Conn. App. 640, 653, 579 A.2d 545, cert. denied, 216 Conn. 820, 581 A.2d 1055 (1990).

We first address the court's decision to apply the interest rate to the difference between the amount recovered by the plaintiff and the amount of the settlement proposed in the offer of compromise, rather than to the total amount recovered by the plaintiff. Section 52-192a (c) expressly provides that "the court *shall* add to the *amount so recovered* eight per cent annual interest on said amount." (Emphasis added.) The statute further sets forth, however, that in the case of a counterclaim plaintiff under General Statutes § 8-132, the court "*shall* add to the amount so recovered eight per cent annual interest *on the difference* between the amount so recovered and the sum certain specified in the counterclaim plaintiff's offer of compromise." (Emphasis added.) General Statutes § 52-192a (c). Under the statute, the court must calculate interest on the difference *only* when the offer of compromise was filed by a counterclaim plaintiff under § 8-132. The plaintiff is not a counterclaim plaintiff. The statute mandates that the court apply offer of compromise interest "on the amount so recovered." "[B]ased upon the statutory language of § 52-192a, it [would be] plain error for the trial court to compute interest only on a portion of the award. . . . The plain language of . . . § 52-192a specifies that the court shall add to the *amount so recovered* [8] percent annual interest on said amount. . . . The trial court clearly did not act in accordance with the mandate of § 52-192a when it awarded interest only on the damages portion of the award. . . . [I]nterest must be awarded on the entire award, that is, the amount so recovered." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Gillis* v. *Gillis*, 21 Conn. App. 549, 556, 575 A.2d 230, cert. denied, 215 Conn. 815, 576 A.2d 544 (1990); see also *Cardenas* v. *Mixcus*, 264 Conn. 314, 323, 823 A.2d 321 (2003) (holding that offer of compromise interest must be calculated on total amount of jury verdict rather than amount remaining after apportionment to employer to

satisfy amount it had paid plaintiff as workers' compensation benefits). It was error for the court to calculate the plaintiff's award of offer of compromise interest on the basis of the difference between the amount of its recovery and the amount of its offer of compromise.

We next address the court's failure to include the prejudgment interest awarded under § 37-3a in the plaintiff's total recovery when calculating its award of offer of compromise interest. This court has explicitly held that an award under § 37-3a must be included in the calculation of interest awarded under § 52-192a. "Unlike § 37-3a, § 52-192a does not depend on an analysis of the underlying circumstances of the case or a determination of the facts. Section 52-192a applies only to civil actions on contracts or for the recovery of money. Wrongful detention of money need not be found. *The interest awarded is in no way discretionary.* The statute provides that the court shall examine the record after trial, and if the plaintiff's recovery exceeds the rejected offer of judgment found in the record, the court shall add interest to that recovery. In an appropriate case, both statutes could apply; the defendant could owe interest as damages on the debt and then owe interest on the total amount based on his refusal to settle." (Emphasis altered.) *Paine Webber Jackson & Curtis, Inc.* v. *Winters*, supra, 22 Conn. App. 653. An offer of compromise, like the offer of judgment that preceded it, is "an offer to settle the entire case, including claims both known and unknown, and both certain and uncertain. . . . In addition to money saved by avoiding litigation expenses, a defendant might also save the discretionary interest of § 37-3a. A defendant must assess the degree of possibility that interest may be awarded in the event that the trier determines that money has been detained by a defendant after it became due. The defendants here risked that a judgment would not include § 37-3a interest. The vagaries of the components of settlement include a possibility that § 37-3a interest will be awarded in some cases. In the present case, the possibility became reality." (Citation omitted; internal quotation marks omitted.) *Flynn* v. *Kaumeyer*, 67 Conn. App. 100, 107–108, 787 A.2d 37 (2001); see also *Gillis* v. *Gillis*, supra, 21 Conn. App. 556 (finding that prejudgment interest awarded under § 37-3a must be included in total amount recovered when calculating offer of judgment interest). Therefore, interest must be awarded on the total amount recovered, including prejudgment interest.

Lastly, we discuss the court's reduction of the percentage of the plaintiff's recovery awarded as offer of compromise interest. "[Section] 52-192a provides for *mandatory* imposition of interest at a set rate, unlike § 37-3a . . . and affords no allowance for the discretion of the court. (Citation omitted; emphasis in original.) *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, 81 Conn. App. 419, 430, 840 A.2d 578, cert. denied, 268 Conn. 922,

846 A.2d 881 (2004). As we have stated, "[t]he interest awarded is in no way discretionary." *Paine Webber Jackson & Curtis, Inc.* v. *Winters*, supra, 22 Conn. App. 653. A comparison between §§ 37-3a and 52-192a informs our conclusion. Section 37-3a provides that "interest at the rate of ten per cent a year, and no more, *may* be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable." (Emphasis added.) This statute gives trial courts the discretion to decide whether to award prejudgment interest at all and the rate to apply. See *Riley* v. *Travelers Home & Marine Ins. Co.*, 173 Conn. App. 422, 461–62, 163 A.3d 1246 (2017), aff'd, 333 Conn. 60, 214 A.3d 345 (2019). By contrast, § 52-192a provides that "the court *shall* add to the amount so recovered eight per cent annual interest on said amount . . . ." (Emphasis added.) Unlike § 37-3a, which establishes 10 percent as an optional maximum, § 52-192a states that the court shall apply 8 percent. Our Supreme Court has stated that use of the word shall generally evidences an intent that the statute be interpreted as mandatory; see, e.g., *DeMayo* v. *Quinn*, 315 Conn. 37, 43, 105 A.3d 141 (2014); and, indeed, this court has consistently interpreted § 52-192 as mandatory. See, e.g., *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, supra, 430. It was improper for the court to calculate the offer of compromise award at the reduced rate of 3.5 percent per year instead of at the mandatory statutory rate of 8 percent per year.

Accordingly, on the plaintiff's cross appeal, we reverse the court's judgment awarding offer of compromise interest to the plaintiff and remand this case to the trial court with instructions to recalculate the amount of that award in a manner consistent with this opinion after determining the amount of attorney's fees and costs to which the plaintiff is entitled under CUTPA and adding that amount to the plaintiff's adjusted total damages for breach of contract.

The judgment is reversed only with respect to the determination that the statute of limitations was tolled as to the plaintiff's breach of contract claim, the amount of damages awarded on the plaintiff's breach of contract claim, the amount of attorney's fees and costs awarded on the plaintiff's CUTPA claim, and the amount of the award of offer of compromise interest, and the case is remanded with direction (1) to render judgment in favor of the plaintiff on the breach of contract claim in the modified amount of $1,204,968.41, (2) to determine, if possible, the amount of attorney's fees and costs that were reasonably incurred by the plaintiff to prosecute that portion of its CUTPA claim that was based on unfair trade practices committed by the defendants within the three year statute of limitations applicable to such claims, and (3) to recalculate the award of offer of compromise interest in a manner consistent with this opinion, after determining the amount of attorney's fees and costs to be awarded on the plaintiff's CUTPA claim

and recalculating the total amount of the plaintiff's recovery herein; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] There was some dispute between the parties as to what was expected of MDS under their oral agreement. Lyons and Young testified that their obligation was to "develop and manufacture a prototype," but Aferzon "insist[ed] there was more," claiming that he expected MDS to produce something "functional, reproducible, and manufacturable." It was undisputed, however, that MDS, at a minimum, had agreed to prepare design drawings and produce a prototype of the device.

[2] A pinion is "a gear with a small number of teeth designed to mesh with a larger wheel or rack." Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 941.

[3] The court "consider[ed] the stock to have a cash value on its date of transfer that [was] the dollar value at a per share value judicially noticed by the court and that MDS used in its damage calculation." This valuation has not been challenged on appeal by either party.

[4] The defendants also asserted waiver, that there was reliance or performance on the part of the plaintiff, laches, unclean hands, and that the plaintiff failed to mitigate its damages.

[5] Additionally, the defendants argued before the court that development expenses of a "lateral" device should also reduce the total compensation received. As the court explained, "[a] 'lateral' device goes into the body from the side. An 'anterior' device is inserted into the body through the front." Although Aferzon and Bash also patented a lateral device and assigned it to ISI, they did not license the lateral device to Alphatec, Alphatec never sold lateral devices, and the defendants never made money from the sale and/or licensing of that device. The court held that the parties' agreement covered only the anterior device and did not consider the development expenses of the lateral device, explaining that any expenses related to the lateral device were irrelevant. This ruling has not been challenged on appeal. Thus, any references to the "device" or the "patented device" throughout this opinion refer only to the anterior device.

[6] The defendants have not challenged on appeal the finding of successor liability or the court's conclusion that the defendants' calculation of expenses was not reliable.

[7] The court also considered, and denied, the defendants' special defenses of unconscionability and mistake. These rulings have not been challenged on appeal.

[8] The court does not explain why it initially calculated the amount of prejudgment interest to which the plaintiff was entitled under § 37-3a until May 4, 2020, even though it issued its memorandum of decision rendering partial judgment for the plaintiff on April 22, 2020. In the end, however, the court's initial selection of that end date for its calculation of prejudgment interest is of no significance because the court later extended the end date of its interest calculation until September 21, 2020, the date of final judgment herein.

[9] The court also suggested, as follows, that it might be awarding attorney's fees both under the common law and under CUTPA: "It's worth noting that the court would award attorney's fees even without CUTPA." So understanding the court's ruling, the parties briefed the propriety of such an award before this court. The trial court, however, issued a supplemental order on October 16, 2020, clarifying that it did not award fees under the common law. Accordingly, that issue is not before this court.

[10] Specifically, the defendants request that the issue should be remanded for the agreement to be reinterpreted based on its plain language: "The defendants are not challenging the trial court's factual findings but, rather, whether those findings are legally material to the fundamental question at hand: is the [patent] within the scope of the November 4, 2004 agreement? The defendants are entitled to a legal analysis that matches the terms of the contract. The trial court misinterpreted the contract, and, therefore, its factual findings do not add up to its conclusion of legal liability."

[11] As mentioned previously, the defendants also argued that the plaintiff was barred from recovering because the profits went to a limited liability company and that they were negated by expenses. The court rejected both of these arguments, and they have not been advanced on appeal.

[12] Associated is a participial adjective of the verb "associate." The definitions provided herein for "associated" are from the entry for the verb "associ-

ate.”

<sup>13</sup> “The issue of infringement focuses on whether a particular device falls within the particular boundaries of a patentee's invention, which are defined by the claims of the patent. *Lemelson* v. *United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985).” *Novametrix Medical Systems, Inc.* v. *BOC Group, Inc.*, 224 Conn. 210, 217–18 n.11, 618 A.2d 25 (1992).

<sup>14</sup> “It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' [*Innova/Pure Water, Inc.* v. *Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)]; see also [*Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)] ('we look to the words of the claims themselves . . . to define the scope of the patented invention'); [*Markman* v. *Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) ('The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.') [aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)].” *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied, 546 U.S. 1170, 126 S. Ct. 1332, 164 L. Ed. 2d 49 (2006).

<sup>15</sup> The court stated: “All we have to do to see the relationship is to look at the drawings beginning with Aferzon's and ending with those in the patent application to see that they are at minimum the same basic idea . . . .”

<sup>16</sup> Aferzon testified that he did not recall receiving these letters or the 2008 e-mails. The court did not find this claim credible and presumed that they arrived. The defendants have not challenged this finding.

<sup>17</sup> The court explained that “the [plaintiff] first learned what it needed to know to sue, at the earliest, in the late fall of 2017 when [the plaintiff's] CEO Lyons was told by his physical therapist that the device was making money and that Bash—whom Lyons knew to be associated with Aferzon— was training physicians about how to use it.” The letters were sent on November 24, 2017, and February 6, 2018. We note that the first letter also states that “your conduct appears to constitute a breach of the [a]greement . . . .”

<sup>18</sup> The court, in its discussion of the continuing course of conduct doctrine, characterized the relationship between the parties as a “special relationship” that was akin to a fiduciary relationship, arising from a “specific, legally recognized duty in contract that was continuing and required Aferzon to report his gains from the device idea to [the plaintiff].” The plaintiff now argues that this relationship is “functionally equivalent to the duty to disclose arising out of a fiduciary relationship . . . .” For the reasons discussed in part I C 2 of this opinion, the court overstates the nature of the parties' relationship and, thus, this conclusion has no bearing on whether fraudulent concealment applies to the defendants' actions.

The plaintiff argues that the court should decide on remand whether the parties had a fiduciary relationship, but, as we explain in part I C 2 of this opinion, there is insufficient evidence for a special relationship, and the court was not able to point to any factors that would give rise to a special relationship. It would be fruitless to consider the issue on remand.

<sup>19</sup> We do not fault the court for its use of both terms, as our Supreme Court indicated in *Bouchard* that, until recently, our courts have used the terms in a manner that would imply that they are interchangeable. See *Bouchard* v. *State Employees Retirement Commission*, supra, 328 Conn. 374 n.14. The trial court also noted the distinction at first, explaining that “[s]ometimes this idea of multiple breaches is called a continuing violation under the label of a 'separate accrual rule.' Other times, tolling is allowed under a version of this doctrine recognizing a series of acts as one long wrong that keeps going until the last wrong act, tolling the limitation period for everything from the first act to the last.” Nevertheless, the court failed to distinguish the two in its analysis.

<sup>20</sup> The plaintiff takes issue with the defendants' citation of this passage, arguing that the “defendants incorrectly quote inapposite dicta in [*Watts* v. *Chittenden*, supra, 301 Conn. 588], regarding 'discrete injuries . . . in suits for lost wages' as if it were a statement of Connecticut law by the Connecticut Supreme Court. . . . In reality, that statement is a quotation attributable to the Seventh Circuit's decision in *Heard* v. *Sheahan*, 253 F.3d 316, 320 (7th Cir. 2001), which, in turn, was citing the Eleventh Circuit decision of *Knight* v. *Columbus*, [supra, 19 F.3d 581–82], discussing whether the 'continuing violation theory' was applicable to a violation of the Fair Labor Standards Act. [29 U.S.C. § 201 et seq.] Importantly, the 'continuing violation theory' is not the same as the 'continuing course of conduct doctrine.' ” (Citation omitted.) The plaintiff is correct that these two cases discuss

"continuing violations" but, as our Supreme Court has stated, the terms have been used interchangeably; *Bouchard* v. *State Employees Retirement Commission*, supra, 328 Conn. 374 n.14; and it is clear that these cases discuss what our courts refer to as a continuing course of conduct: "The term 'continuing violation' also implies that there is but one incessant violation and that the [plaintiff] should be able to recover for the entire duration of the violation, without regard to the fact that it began outside the statute of limitations window. That is not the case. Instead of one [ongoing] violation, this case involves a series of repeated violations of an identical nature. Because each violation gives rise to a new cause of action, each failure to pay overtime begins a new statute of limitations period as to that particular event." *Knight* v. *Columbus*, supra, 582.

Regardless of the terminology used by the courts in *Knight* and *Heard*, our Supreme Court clearly cited the passage as an example of what would *not* qualify as a continuing course of conduct. *Watts* v. *Chittenden*, supra, 301 Conn. 587–90. To argue that the passage is not Connecticut law because it was ultimately derived from federal cases is inaccurate, especially considering that the passage has since been cited in other Connecticut cases discussing the continuing course of conduct doctrine. See, e.g., *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 838.

[21] In so doing, we note that if the plaintiff's adjusted recovery falls below the amount of its unified offer of compromise pursuant to § 52-192a, the plaintiff's cross appeal would be rendered moot.

[22] The defendants did plead in their answer that the plaintiff's claims were barred by the statute of limitations set forth in § 42-110g.

[23] General Statutes § 52-192a provides in relevant part: "(a) Except as provided in subsection (b) of this section, after commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may, not earlier than one hundred eighty days after service of process is made upon the defendant in such action but not later than thirty days before trial, file with the clerk of the court a written offer of compromise signed by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying the action for a sum certain. For the purposes of this section, such plaintiff includes a counterclaim plaintiff under section 8-132. The plaintiff shall give notice of the offer of compromise to the defendant's attorney or, if the defendant is not represented by an attorney, to the defendant himself or herself. Within thirty days after being notified of the filing of the offer of compromise and prior to the rendering of a verdict by the jury or an award by the court, the defendant or the defendant's attorney may file with the clerk of the court a written acceptance of the offer of compromise agreeing to settle the claim underlying the action for the sum certain specified in the plaintiff's offer of compromise. Upon such filing and the receipt by the plaintiff of such sum certain, the plaintiff shall file a withdrawal of the action with the clerk and the clerk shall record the withdrawal of the action against the defendant accordingly. If the offer of compromise is not accepted within thirty days and prior to the rendering of a verdict by the jury or an award by the court, the offer of compromise shall be considered rejected and not subject to acceptance unless refiled. Any such offer of compromise and any acceptance of the offer of compromise shall be included by the clerk in the record of the case. . . .

"(c) After trial the court shall examine the record to determine whether the plaintiff made an offer of compromise which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain specified in the plaintiff's offer of compromise, the court shall add to the amount so recovered eight per cent annual interest on said amount, except in the case of a counterclaim plaintiff under section 8-132, the court shall add to the amount so recovered eight per cent annual interest on the difference between the amount so recovered and the sum certain specified in the counterclaim plaintiff's offer of compromise. The interest shall be computed from the date the complaint in the civil action or application under section 8-132 was filed with the court if the offer of compromise was filed not later than eighteen months from the filing of such complaint or application. If such offer was filed later than eighteen months from the date of filing of the complaint or application, the interest shall be computed from the date the offer of compromise was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. This section shall not be interpreted to abrogate the contractual rights of any party concerning the recovery of attorney's fees in accordance with the

provisions of any written contract between the parties to the action."

[24] Section 52-192a specifies that the interest should be calculated from the date the complaint was filed. The court appropriately used this date.

[25] The court stated: "To make this adjustment, for purposes of the offer of compromise statute, the court treats as the amount recovered the damages award in the amount of $1,587,289 and the attorney's fee award of $756,000 for a total recovery of $2,343,289. The offer of compromise was for $1,150,000. The extra amount recovered gets the 8 percent rate. It is derived by subtracting from the total recovery of $2,343,289 the $1,150,000 offer of compromise amount yielding an amount in excess of the offer of $1,193,289."

[26] We note that § 52-192a was amended in 2005 by, inter alia, the substitution of "offer of compromise" for "offer of judgment" and other technical changes. See Public Acts 2005, No. 05-275, § 4. The general function of the statute remains the same and, thus, case law from before the amendment is still applicable. See, e.g., *Georges* v. *OB-GYN Services*, *P.C.*, 335 Conn. 669, 680–81, 240 A.3d 249 (2020) (applying case law that predates amendment in discussion concerning offer of compromise interest).